672 A.2d 109

**In re RUSSELL G.**

**No. 464, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Feb. 28, 1996.

Sean F. Murphy (Thomas L. Crowe and McGuire, Woods, Battle & Boothe on the brief for appellant, Kim C.), Baltimore, for Appellant.

Shelly E. Mintz, Assistant Attorney General, Baltimore (J. Joseph Curran, Jr., Attorney General, on the brief for appellee, MCDSS) (Joanne T. Wills, Rockville, on the brief for appellee, Russell G.), Carrie Ward, New Carrollton, (Sanford Z. Berman and Houlon & Berman, on the brief for appellee, Frank G.), for Appellees.

Argued before MOYLAN, BLOOM and WENNER, JJ.

BLOOM, Judge.

The District Court of Maryland, sitting as a juvenile court in Montgomery County, adjudicated Russell G., the minor child of appellant, Kim C., and appellee Frank G., to be a child in need of assistance (CINA), committed the child to the custody of appellee Montgomery County Department of Social Services (DSS) for placement in the care and physical custody of Frank G. under DSS's supervision, and limited appellant's visitation with her son to one supervised visit per week.

In this appeal from that adjudication and disposition, Kim C. presents this Court with four issues:

1. Whether the Juvenile Court clearly erred in finding that Russell G. was a child in need of assistance when the evidence showed that at least one parent was able and willing to provide him with ordinary care and attention.

2. Whether the actions of the Juvenile Court in placing time limitations on direct examination of the mother, prohibiting the testimony of other witnesses for the mother, not allowing closing arguments and in making a disposition decision based on a finding of a psychological disorder in the mother, that was not adjudicated nor alleged in the Petition, resulted in an unfair hearing that violated the mother's Due Process rights.

3. Whether the admission of a psychiatric evaluation prior to the first disposition hearing violated the express direction of Courts & Judicial Proceedings Article § 3–818 that such reports are only admissible "at a disposition hearing."

4. Whether the Juvenile Court's factual findings, that it was necessary to continue removal of Russell G. from his mother, were clearly erroneous, and the continued removal was an abuse of discretion.

## Factual Background

Kim C. and Frank G. are the natural parents of Russell G., born 3 March, 1990. The couple never married and the relationship ended shortly after Russell G.'s birth. Kim C., a pharmacist, has had sole custody of Russell G. from birth.

Kim C. is a recovering alcoholic. She had a relapse in 1993. Various reports from different individuals at Kim C.'s apartment complex regarding Kim C.'s reckless behavior led the DSS to file a petition before the juvenile court requesting that Russell G. be found to be a CINA.

After an emergency shelter care hearing, the juvenile court ordered that Russell G. be placed under its jurisdiction and be committed to the Montgomery County Department of Social Services for placement in the care and custody of his father, Frank G. Additionally, the juvenile court ordered that Rus-

sell G.'s mother, Kim C., have visitation privileges under the direction of the Montgomery County DSS. Subsequent to the shelter care hearing, but prior to adjudication, Kim C. requested that the CINA petition be dismissed for lack of jurisdiction, on the grounds that at least one parent, Frank G., was willing and able to give Russell G. proper care and attention. The juvenile court denied the motion.

After an adjudicatory hearing, the court ruled that Russell G. was a CINA, and it left the child in the care and physical custody of his father.

Following a disposition hearing, which was held on 28 September and 6 December 1994, the court reaffirmed its prior commitment of the child to the custody of DSS for placement in the care and physical custody of Frank G., subject to supervision by DSS. Kim C. is limited to one supervised visitation each week with her son.

Extensive testimony was taken at the adjudicatory hearing regarding Kim C.'s alcoholism and dangerous behavior. Mary Lounder, who worked at the front desk of the apartment complex where Kim C. lived, testified that she observed Kim C. "disheveled" and her speech slurred at least a half dozen times. In one instance, Lounder saw Kim C. place Russell G. at the head of a staircase while she went to the other side of the building to get her mail. Seeing the child fall down several times, and fearing that the child would fall down the stairwell, Lounder ran to the child and picked him up.

Tony Griggs, property manager of the apartment complex, testified to several instances of Kim C.'s intoxication. In one instance, she observed Kim C. appearing intoxicated, with her "eyes glassed over," and her "speech slurred," saying that she and Russell were going to the beach. In another instance, she observed Kim C. so intoxicated that she could not even coordinate Russell G.'s stroller into the elevator. She also witnessed Kim C. in the elevator so intoxicated that she had her eyes closed and was hanging onto the railing trying to brace herself. When the elevator stopped, Russell G. walked out of the elevator without Kim C. even noticing.

Clinton McCaleb, a private security guard at Kim C.'s apartment complex, testified that he saw Kim C. sitting in her car in the parking garage, drinking out of a bottle of wine, with Russell G. sitting in the front seat. He testified that Kim C. subsequently requested him not to write up the incident report because "she didn't want to lose her son."

Sergeant Anita Green, site supervisor of security at the apartment complex, testified that Kim C. "flipped [her] the finger" and then tried to run over Sgt. Green with her car while Russell G. was in the front seat, after Sgt. Green had issued her a citation for parking in a fire zone. Sgt. Green smelled alcohol and believed that Kim C. was intoxicated.

Frank G. testified that he respected the decisions that Kim C. made regarding schooling and doctors. Additionally, he testified that they often had heated battles, centered principally on money needed for child support. As a result, Frank G. began avoiding Kim C. in order to prevent conflict. Frank G. was aware of Kim C.'s alcoholism; he helped pay for her treatment when she had a relapse in 1987. Frank G. testified that he believed that Kim C. remained sober thereafter from 1987 to 1994. He observed only one instance in those 7 years that concerned him, and he immediately reported it to the DSS. When the DSS did not take action, he initiated custody proceedings in 1992. The custody proceeding ended in 1993 when the two voluntarily entered into a consent custody agreement that gave Kim C. sole custody of Russell G. Frank G. claims that he did not become aware of Kim's C.'s most recent relapse until he was contacted by someone at her apartment complex in March of 1994. He testified that he immediately contacted and met with the investigating DSS social worker and filed a petition in Montgomery County Circuit Court for modification of the custody agreement.

Kim C.'s only witness at the adjudicatory hearing was her mother, Mary Atkinson. Ms. Atkinson testified as to Kim C.'s continued sobriety since Russell G.'s removal.

After the adjudicatory hearing, the juvenile court determined that Russell G. was a child in need of assistance. The

court first found that the Kim C. was unable or unwilling to take care of the child. "She was drunk with the child, drunk without the child, combative, explosive, drinking in the car, with the child, drinking in the car without the child." The court next found that Frank G. was also either unable or unwilling to take care of Russell G.

> I think that [Frank G.] wanted, dearly wanted visitation with Russell. I think that something closed his eyes to seeing the obvious, that the woman who he had this child with, who he had known was an alcoholic, because he helped place her in Second Genesis, years before. Who he knew relapsed into full-blown alcoholism, he chose to ignore. He chose to ignore that she was drunk and carrying his child in her car. He chose to ignore that she was drunk or uh, not paying proper attention when he dropped the child off. He chose to ignore the emotional damage that she caused the child, in screaming at him, Mr. G. in the child's presence. And, an actual, physical fight that apparently resulted in, in harm, uh, to the mother, in front of the child, when the father walked off at visitation with the child to the elevator.

The court then went on to rule that Frank G. was also "unable" to care for the child because he did not have legal custody.

> [Frank G.] also didn't have legal custody. And, the statute does not speak to whether or not the inability to give proper care and attention to a child, or unwillingness to give proper care and attention to a child is from any source. It doesn't restrict the source. The inability could be as simple as not having legal custody.

As a result of finding that both Kim C. and Frank G. were unable or unwilling to take care of Russell G., the court concluded that Russell G. was a child in need of assistance.

Just prior to the adjudicatory hearing, the juvenile court ordered that Russell G. and his parents undergo psychiatric examinations by a "disinterested child psychiatrist." Dr. James Hutchinson was selected as the independent child

psychiatrist. Dr. Hutchinson's report contained a negative description of Kim C. Dr. Hutchinson concluded that Kim C. still "remains in the grip of her addiction," finding that her behavior was incompatible with one in remission. Additionally, Dr. Hutchinson opined that Kim C. suffers from a personality disorder that is severely destructive to Russell G.'s development. He reported:

> Unfortunately [Kim C.'s] problems in parenting her son do not stop with her severe addictive problem. My examination suggests that in addition to her addictive problems she has a characterological problem which leads to interactions with her son when she is sober that are highly destructive to him. During the evaluation she stimulated him in a provocative manner both sexually and aggressively then vigorously controlled and punished his natural responses. She did not attend to signals that he was overwhelmed. At times she punished aggressive responses that he made in play as if they were real aggression. When he did demonstrate anger towards her she overreacted. There was no respect for his autonomy. She repeatedly intruded in what he wanted to do and changed the direction of the play and forced compliance from him. She demonstrated the intensity of her own narcissistic needs by hurting him in order to force him to look at her when he tried to withdraw from the barrage of stimulation. There was a constant teasing and belittling. Only by constantly reminding myself of the Court's need for a thorough evaluation could I restrain myself from intervening to protect Russell during this interview.

Three weeks prior to the first disposition hearing, DSS moved for the admission of Dr. Hutchinson's report. Over Kim C.'s objection, the juvenile court accepted Dr. Hutchinson's psychiatric report for filing.

At the disposition hearing, Kim C. introduced two expert witnesses to counter Dr. Hutchinson's report. Dr. Greenwood testified that Dr. Hutchinson did not have enough information to reach his conclusions regarding Kim C. Furthermore, Dr. Greenwood contended that it is "usually impossible" to make a

personality disorder type diagnosis when a person is in a crisis such as Kim C. Dr. Greenwood stated that he did not see any "serious substantiation" of the personality disorder that Dr. Hutchinson diagnosed.

Dr. Mealy, Kim C.'s psychologist, was extremely critical of Dr. Hutchinson's report. He stated:

> I think there's some substantial problems in this report and . . . as a therapist and someone who has evaluated Kim C. I would say that it is a very imbalanced picture that primarily what is left out of this are a series of strengths that she has exhibited and an overemphasis on negative qualities to the point where I think it's almost a grotesquely distorted outcome in terms of viewing her.

Although for insurance purposes Dr. Mealy diagnosed Kim C. as depressed with an atypical anxiety disorder, he concluded that Kim C. was not a danger to the child and that she "could move forward in a pretty . . . significant way."

On the final day of the disposition hearing, the trial judge reminded trial counsel of the limited time remaining. When appellant's counsel called Kim C. to the stand, the judge requested that her testimony be limited to thirty minutes because of the severe time constraints. Kim C. testified that she had been sober for nine months. Additionally, Kim C. voluntarily resumed her participation in Alcoholics Anonymous and was taking Antabuse daily. Kim C. further testified that she contracted with the Maryland Pharmacists' Rehabilitation Committee for an alcoholic treatment and monitoring program, agreeing to regular urinalysis, appropriate therapy, and continued monitoring by a committee representative for a minimum of two years.

The trial judge interrupted Kim C.'s testimony, telling appellant's counsel that she had 15 minutes left and asking her how she would like to use it. Kim C. was dismissed from testifying and her counsel used the remaining 15 minutes to proffer the testimony of three witnesses. Stephen Haiber, Kim C.'s pharmacy supervisor, would have testified that Kim C. has been a devoted worker and that he had seen no

evidence of any kind of substance abuse at all; Dee Cohen, who supervised a number of visits between Kim C. and Russell G., would have testified that she never observed anything other than "love and contact" [sic] between Russell G. and Kim C. and never saw any inappropriate behavior of any kind; Kelly Owen, the supervising social worker, would have testified that she never saw any inappropriate behavior on the part of Kim C. and never believed that Russell G. was in any danger.

After DSS's last witness, Dieta Harp, was cross-examined, the trial judge began to state her ruling without permitting closing argument. The court found that it is in the best interests of Russell G. to stay with his father. Although the judge observed that Kim C.'s alcoholism is in abeyance, she believed that Kim C. had a personality disorder, and she was concerned that the identity of the child was "being fused with the identity of the mother." The judge ordered that Russell G. was to receive individual therapy, and Kim C. was limited to a one-hour supervised visit per week at the DSS offices.

## Discussion

### I

The juvenile court has exclusive original jurisdiction over a child "alleged to be delinquent, in need of supervision, in need of assistance or who has received a citation for a violation." Md.Code (1974, 1995 Repl.Vol.) § 3-804(a) of the Courts & Judicial Proceedings Article (C.J.). C.J. § 3-801(e)(2) defines a "Child in Need of Assistance" (CINA) as one whose "parents, guardian or custodian are unable or unwilling to give proper care and attention to the child...."

Based on its ruling that Russell G. is a CINA, the juvenile court assumed jurisdiction over the case. In reaching that conclusion, the court found that both parents were unable or unwilling to care for Russell G.: the mother was unable to care for Russell G. because of her bouts with alcoholism and her personality disorder; the father was unable to care for Russell G. because he turned his back on the mother's obvious

alcoholism and inability to care for Russell G. The court also declared, in the alternative, that Frank G.'s lack of legal custody rendered him unable to care for Russell G.

Appellant presents two arguments with regard to the jurisdictional issue: first, that a proper reading of C.J. § 3–801(e) requires a finding that both parents are unable or unwilling to care for the child in order to adjudicate that the child is a CINA, because the statute refers to plural "parents" in contrast to its reference to a singular "guardian" and a singular "custodian," and second, that the juvenile court erroneously concluded that Frank G. was unable or unwilling to provide Russell G. with proper care and attention.

This Court's first task is to interpret § 3–801(e) to determine the legislative intent. Why does the statute use the plural noun "parents," in contrast to its use of the singular nouns "guardian" and "custodian"? To answer that question, we look first to the plain meaning of the words of the statute. The plain meaning, however, is "controlled by the context in which it appears." *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514, 525 A.2d 628 (1987). "The aim or policy of the legislation, against which we measure the words used, is 'not drawn ... out of the air; it is evinced in the language of the statute as read in the light of other external manifestations of that purpose.'" *Id.* (quoting Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 538–39 (1947)). In examining the context in which the words in the statute were written, we may consider, *inter alia*, "a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal." *Id.* at 515, 525 A.2d 628.

The language of the statute is clear and unambiguous. A child in the care of a guardian or custodian is a CINA if that guardian or custodian is unable or unwilling to give proper care and attention to the child. But a child in the care and custody of a parent or parents is a CINA only if *both*

parents are unable or unwilling to give the child proper care and attention. No other interpretation would give effect to the statutory use of the plural noun "parents." Furthermore, that interpretation comports with the purpose of the CINA statute. A child who has at least one parent willing and able to provide the child with proper care and attention should not be taken from both parents and be made a ward of the court.

The trial judge found that appellant was not able to provide Russell G. with proper care and attention because she had a drinking problem and a mental problem. There was certainly sufficient evidence, in the form of testimony about her behavior on various occasions and in the opinion rendered by Dr. Hutchinson that she had a personality disorder, to support that finding.

Appellant challenges the court's finding that the child's father, Frank G., while willing, is unable to give the child proper care and attention. At first glance, it may appear illogical for the court to determine that a parent cannot give a child proper care and attention and at the same time place the child in the care and custody of that parent. The two rulings are not necessarily inconsistent, however. A parent may be deemed to be unable to give proper care and attention to his or her child by virtue of lack of parenting skills, knowledge, or experience but may become capable with some assistance from and supervision by the DSS. In this case, the court did commit the child to the custody of DSS, for placement of the child in the physical care and custody of Frank G. under the DSS's supervision.

Our review of the factual and legal bases for the court's finding that Frank G. was unable to provide his son with proper care and attention, however, convinces us that that finding was both clearly erroneous and legally incorrect.

We first address the factual basis for the finding of the father's inability or unwillingness to care for the child. The court stated that Frank G., knowing that Kim C. was an alcoholic and that she had relapsed into full-blown alcoholism, chose to ignore that; chose to ignore that she was drunk while

driving with the child in her car; chose to ignore the fact that she was drunk or not paying proper attention when he returned the child after visits; and chose to ignore the emotional damage that Kim C. caused to the child by screaming at Frank G. when he returned the child after visits.

Those factual bases for concluding that Frank G. was unable or unwilling to give proper care and attention to his son are analogous to the facts in *In re: Joseph G.*, 94 Md.App. 343, 617 A.2d 1086 (1993). In that case, the juvenile court found an infant child to be a CINA because neither parent was willing or able to give proper care and attention to the child. That finding was based on evidence that the mother had intentionally injured the baby, but the father, in the face of that evidence, refused to believe that the mother was capable of harming the child. We affirmed the CINA finding.

The difference between *In re: Joseph G.* and this case is that in *In re: Joseph G.* there was evidence supporting the juvenile court's finding that the father chose to disregard facts showing that the mother had deliberately injured the child. In this case, the evidence was insufficient to support the court's finding that Frank G. ignored certain facts known to him: that Kim C. had relapsed into full-blown alcoholism, that she drove her car with the child in it when she was drunk, that she was drunk when he returned the child to her after visits with the child, and that she caused emotional damage to the child by screaming at Frank G. when he returned the child after visits. There was indeed evidence from which the court could find that Kim C. had relapsed into "full-blown alcoholism" and that she had driven her car, with the child as a passenger, while intoxicated. But there is no evidence supporting the court's finding that Frank G. was aware of and ignored or disregarded those facts. He denied being aware of the incidents of drunken behavior described by other witnesses, and there is no evidence to support a conclusion that anyone told him about Kim C.'s endangering the child by driving while intoxicated or other occasions when she appeared to have been drinking heavily. Frank G. testified about Kim C.'s abusive behavior to him when he returned the

child after visits, but there was no evidence that Kim C. was intoxicated on those occasions or, if she were, that Frank G. was aware of it. Nor is there any evidence that Frank G. was aware of any emotional damage or danger to the child as a result of Kim C.'s outbursts, which reflected her anger at him, not the child.

What the evidence discloses is actually contrary to the court's finding. Rather than choosing to ignore indications that Kim C. was not properly caring for their child, when he became aware of problems Frank G. took appropriate steps to protect the welfare of the child. He knew of Kim C.'s alcoholism but believed that she remained sober from 1987, when he helped pay for her treatment when she had a relapse, until 1994. During those seven years, he observed only one instance that concerned him, and he reported it immediately to DSS and thereafter initiated custody proceedings, which resulted in a consent decree. In March of 1994, when informed of Kim C.'s drinking and erratic behavior, he again contacted DSS and moved for modification of the consent decree.

In short, the evidence simply did not support the factual findings upon which the court based its conclusion that Frank G. was unwilling or unable to give Russell G. proper care and attention because he was aware of and ignored matters indicating that the child was not receiving proper care from Kim C.

With respect to the second basis for the juvenile court's finding that Frank G. was unable to give Russell G. proper care and attention, we perceive no legal, logical, or factual support for the proposition that lack of legal custody prevented the father from caring for the child. It may perhaps be arguable that, at least theoretically, lack of physical custody may render a parent unable to give a child care and attention (except during visits), but we need not address that abstract proposition here. By the time of the adjudicatory hearing, Russell G. was and had been in the care and physical custody of his father, by virtue of the court's emergency shelter care

order, and was then apparently receiving proper care and attention from Frank G.

We hold, therefore, that the juvenile court erred in finding Russell G. to be a CINA, because such a finding can only be made if both parents are unwilling or unable to give him proper care and there was no evidence to support a finding that the father, Frank G., was either unwilling or unable to care for the child.

## II

Our holding on the jurisdictional issue, that the juvenile court erred in adjudicating Russell G. to be a CINA, makes it unnecessary for us to address the remaining issues in this case. We do wish to comment, however, on appellant's complaint that the juvenile court conducted its disposition hearing in such an arbitrary manner that her due process rights were violated. Our review of the record persuades us that appellant's complaint is not without foundation. While it is not inappropriate, as a general rule, for a court to impose reasonable time limitations for the trial of a case, in order to avoid needlessly repetitious evidence or argument, it is not appropriate to limit the time or refuse to deviate from a limit previously fixed if the effect will be to prevent a party from presenting his or her case fully. We can perceive of no more important case than one involving parental relationships, including the custody of a party's child, and it is far better for the court to run the risk of repetitious or irrelevant evidence or argument than to give the appearance of arbitrariness. In this case, the parties had apparently agreed that a total of six hours would suffice for the disposition hearing. Obviously, it was not sufficient. Appellant was rushed through the presentation of her case. She was not allowed to present it in the order planned by her attorney; the court insisted that she cross-examine Dr. Hutchinson on his report before she testified, and, as a result, the allotted time expired before appellant concluded her testimony or had an opportunity to call any other witness. As a final blow to her case, her counsel was not permitted to make a closing argument.

From our reading of the record, particularly the comments of the trial judge, we can readily understand how appellant may have perceived that the trial judge had already decided on the disposition, based on Dr. Hutchinson's report and the evidence presented at the adjudicatory hearing, and was unwilling to listen to more testimony or argument that would not change her mind. We trust that that perception was mistaken; nevertheless, that it was created is deplorable. A judge should try to avoid, at all reasonable cost, the appearance that he or she has prejudged the case at any stage.

ADJUDICATION THAT RUSSELL G. IS A CHILD IN NEED OF ASSISTANCE AND DISPOSITION BASED THEREON REVERSED.

COSTS TO BE PAID BY APPELLEES.