The judgment appealed from is accordingly,

*Affirmed.*

In re D.S., K.M., B.S., R.S., T.S. & P.S.

**J.M., Appellant.**

Nos. 10–FS–1556, 10–FS–1557, 10–FS–1558, 10–FS–1559, 10–FS–1560, 10–FS–1561.

District of Columbia Court of Appeals.

Argued March 8, 2012.

Decided Sept. 20, 2012.

Leslie J. Susskind, appointed by the court, for appellant.

Mindy Leon, appointed by the court, Guardian ad Litem for appellees D.S., K.M., B.S., R.S., T.S. & P.S., filed a statement in lieu of brief.

Beverli B.V. Wynn–Euell, appointed by the court, for appellee V.S., filed a statement in lieu of brief.

Dana K. Rubin, with whom Irvin Nathan, Attorney General for the district of Columbia, and Todd S. Kim, Solicitor General, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and BECKWITH, Associate Judges, and FERREN, Senior Judge.

BECKWITH, Associate Judge:

This case involves the ardent yet unsuccessful effort of an unwed biological father of six children to keep these children after their mother's abuse of them led first to their removal from her home, then to her stipulation that they were neglected, and ultimately to their commitment to the District of Columbia Child and Family Services Agency (CFSA) over the father's objections and without any finding that he was an unfit parent. We conclude that the trial court's determination that it was in these children's best interest to be committed to CFSA for up to two years failed sufficiently to take into account a fit parent's right to presumptive custody-a right that applies in temporary custody determinations in neglect proceedings as well as in cases involving the termination of parental rights. *In re J.F.*, 615 A.2d 594, 598 (D.C. 1992). This parental presumption stems from well-established principles from our cases, our laws, and the United States Constitution: the principle that a "child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit," *In re S.G.*, 581 A.2d 771, 786 (D.C.1990) (Rogers, C.J., and Ferren, J., concurring); the presumption in the neglect statute that "it is generally preferable to leave a child in his or her own home," D.C.Code § 16–2320(a) (2001);[1] and the constitutional principle, rooted in the Due Process Clause, that the right to presumptive custody of a fit, unwed, noncustodial father who has grasped the opportunity to be involved in his child's life can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with someone else. *Stanley v. Illinois*, 405 U.S. 645, 656–58, 92 S.Ct. 1208, 31 L.Ed.2d 551

1. All sections of the D.C.Code cited to in this opinion are to the 2001 version unless otherwise specified.

(1972); *In re J.F.*, 615 A.2d at 598. We reverse the trial court's order committing the children to CFSA and remand to the trial court for reconsideration of the appropriate disposition under the correct legal standards.

## I. Factual and Procedural History

On June 1, 2010, CFSA received a hotline tip reporting that four-year-old P.S. had sustained an eye injury and had told staff at her school that her mother, V.S., had hit her in the face with a boot when P.S. would not stop crying. That day, a CFSA social worker conducted interviews with P.S. and her five siblings—eleven-year-old K.M.; nine-year-old B.S.; R.S., who was two weeks shy of his eighth birthday; and six-year-old twins D.S. and T.S. The agency determined that immediate removal from the mother's home was necessary and placed the children in three different foster homes after P.S. told the social worker that "mommy hit [her] with a boot," K.S. reported that her mother "still hits [her]" and had previously punched her in the eye, several of the children stated that their mother hit them with a belt, and a medical examination revealed that P.S. had unexplained marks on her legs and scars on her buttocks that she said were caused by her mother hitting her with a broom. CFSA notified the mother that the children had been removed from her home and that a family team meeting would be held in two days, but the agency failed to locate the children's father, J.M. The mother and several of the children told the social worker that the father was in the hospital, but they did not know which hospital.

From the outset CFSA received information that the children's father did not live with the children at their mother's home but that he had a significant relationship with them. R.S. told the investigator that his father did not live at home, and K.M. added that the siblings stayed with their father every weekend, Friday through Sunday. The children's mother also told the investigator that the father was involved with the children prior to his hospitalization. K.M., R.S., and B.S. each said that they felt safe with their father— R.S. specifically said "my daddy keeps me safe"—while B.S. said he "sometimes" felt safe with his mother and K.M. and R.S. said they did not feel safe with her.

In the two days following the children's removal, CFSA still failed to locate the father to notify him of the June 3, 2010, family team meeting. The father nevertheless found out about the meeting and participated over the telephone in the parties' discussion of the abuse and neglect allegations and the services that were available for the children.

Over the course of the next three months, the children's parents took part in four hearings pertaining to the neglect proceedings: the initial hearing on June 4, 2010, at which the government served the parents with petitions alleging that the children were neglected and the father acknowledged paternity of all six children; the pretrial hearing on July 30, 2010; the August 12, 2012, hearing at which the mother stipulated to the children's neglect and the magistrate judge adjudicated all six children to be neglected; and the disposition hearing on August 27, 2010, at which the court committed the children to the custody of CFSA for at least two years. Throughout these proceedings, which were presided over by Superior Court Magistrate Judge Lori Parker, the father repeatedly requested immediate release of all six of his children into his custody.

At the initial hearing, which the father attended after having been released from the hospital that morning, a dispute immediately arose over the questions whether the father lived with the mother and children and, if he lived somewhere else,

whether the eldest child, K.M., lived with him. Notwithstanding the children's unequivocal indications to the contrary during their interviews, the government's petition indicated—and the government maintained at the hearing—that the entire family lived together at the mother's home on Alabama Avenue.[2] Yet the Guardian ad Litem (GAL) noted that when she had spoken to R.S. and B.S. the night before the hearing, "they definitely spoke of two[ ] different homes." And with respect to K.M.'s address, although the GAL said that K.M. herself referred to her mother's house as "home," both parents indicated that she lived with her father and was listed on his lease, and the father's counsel said he was "prepared to prove" that she had been living with her father and asked that K.M. be returned to his care immediately. The magistrate judge did not take any evidence or resolve the dispute over where K.M. lived, but ordered the government to investigate the father's address. The government later amended the neglect petition to reflect the father's correct address.

Also at the initial hearing, the mother waived her right to a probable cause hearing. The father explicitly stated that he was not waiving a probable cause hearing, but did not object to the mother's waiver. The father's attorney argued that the government's efforts to prevent removal of the children were not reasonable because the father "was available to the agency for further investigation" even while hospital-

ized, "he is here today at the time that the Court is making the decision with respect to removal," and he "is ready, willing, and able to take care of the children." The magistrate judge found that, in light of the father's initial unavailability and the nature of P.S.'s injury, the government's efforts to prevent removal—efforts it was required by law to demonstrate—were reasonable.[3] Finally, over the father's strong objections, and despite the GAL's statement that "the boys" told her "they love going to dad" and that "several of the children … express[ed] feeling safe with their father," the court adopted the government's recommendation that the father be allowed only supervised visitation with his children, stating that CFSA needed time "to determine that unsupervised visits would be in the children's best interest."

When the parties reconvened on July 30, 2010, for a pretrial hearing, the magistrate judge, who had in the interim already rejected the father's motion for reconsideration of the court's ruling rejecting his request for custody of his children, also rejected the father's renewed request for liberal unsupervised visitation. The court did so in "an abundance of caution" after the government and the GAL expressed concerns about the father's health and the children's extensive tooth decay. The father's counsel objected to the lack of notice and opportunity to respond to new allegations that both parents had neglected the children's dental health,[4] and complained

---

2. The petitions also stated that a CFSA social worker had been unable to speak with the father because she had not determined where he was hospitalized.

3. Our law requires the family court to determine whether the government made "reasonable efforts" to prevent removal of the child from the home. D.C.Code § 16–2312(d)(3). Relatedly, D.C.Code § 16–2310(b) states that a child cannot be placed in shelter care unless it is clear that shelter care is required to

protect the child or because he has no parent or other person to care for him and "no alternative resources or arrangements are available to the family that would adequately safeguard the child without requiring removal." The reasonable efforts requirement is discussed in further detail *infra* at 900.

4. In the parties' joint pretrial statement, the GAL contended that the parents "failed to provide proper parental care necessary to

that the government's requests to restrict the father's parental rights should be based on "more than just the fact that they have concerns" and the government should have to present "facts upon which the Court can rest its ruling." The government responded that it was important for the judge to have "a total mosaic of what's been going on in this family" and "all information that it deems necessary in order to make a decision as to whether or not these children have been abused or neglected."

On August 12, 2010, the magistrate judge accepted the mother's stipulation of neglect as to each of the children and adjudicated all six children neglected. The father attended the proceeding and did not object.

The disposition hearing was held on August 27, 2010. The government and GAL recommended commitment of the children to CFSA with a goal of reunification by June 1, 2011. By this point, the children had for several weeks been living at the Maryland home of K.V., the children's paternal aunt and foster care provider, and the government asked the magistrate judge to maintain the supervised visitation arrangement. The government and GAL continued to oppose granting custody of the children to the father—including the father's latest request that the children be released to him under protective supervision—based upon ongoing concerns about the father's lung disease,[5] his problems controlling anger,[6] and the adequacy of his home,[7] and upon the government's view that "[t]here is still very little information known about Mr. M."

Acknowledging the concerns that had been expressed regarding the father's

---

protect the health of their children," specifically noting the children's need for treatment for serious tooth decay. Arguing that this was "a whole new topic of neglect" "only two weeks away from trial," the father asked that the court order the government to proceed to trial on the original petitions. After a discussion of the necessity to formally amend the petition, the government informed the parties on the record that the petition now included charges relating to dental neglect. The petitions were never formally amended.

5. Throughout these proceedings, the government and GAL raised concerns about the father's lung condition and the fact that he remained seated during at least one of his supervised visits with his children. The father's attorney disputed a claim in a pretrial report that the father had to be hospitalized monthly, asserting that his lung condition was under control, that he was capable of "actively parenting his children," and that it was appropriate to remain seated during visits in which everyone else was seated. With respect to the government's concerns about his "ability to monitor such active kids," the father himself stated that "we go walking," "we go to the store or the playground" that was right outside his door, and "I have all day to watch them play."

6. The GAL stated, for example, that she had witnessed some "anger management problems," including a voice message the father left for his sister, K.V., in which he used profanity when referring to the children. K.V. called the outburst "an isolated incident" and stated that her brother had not used profanity in front of the children.

7. The government objected to the father's request for release of his children under protective supervision based in part upon concern "as to whether or not [the father's] current housing situation would support all six of the children." While a social worker had visited the father's apartment, Della Hoffman, the ongoing social worker on the case, stated at the disposition hearing that she had not been to the father's apartment but that she "believe[d]" it was "a two or a three bedroom" apartment. Almost three months after the children's removal from their mother's home, the government still claimed to have insufficient information to allow the father to have unsupervised visits, no less custody of his children. For his part, the father stated at the hearing that he had "taken care of [his] kids before we came into this court system."

health and the adequacy of space in his apartment, the magistrate judge committed the children to the care of CFSA for a period not to exceed two years with the future goal of reunification with a parent, denied again the father's request for unsupervised visitation, and ordered the father to submit to a mental health evaluation.[8] The father filed a motion for review of the shelter care order, the visitation order, and the disposition, and on November 29, 2010, Associate Judge Jeannette Clark issued an order affirming the decision of the magistrate judge. The father now appeals from that order.

## II. Analysis

On appeal, Mr. M. challenges the trial court's order committing his children to CFSA in the absence of any proof that he was an unfit parent and, he claims, contrary to his constitutional due process rights and to the statutory presumption recognizing "that it is generally preferable to leave a child in his or her own home." D.C.Code § 16–2320(a). He also argues that the trial court abused its discretion in the way it conducted the initial hearing at which the court ordered the children to be placed in shelter care pending the disposition hearing,[9] and that it erred in imposing supervised visitation, particularly when he was not involved in the physical abuse that

led to their removal and when he routinely had the children at his home on weekends.

### A. The Father's Challenge to the Children's Commitment to CFSA

#### 1. Governing principles

We have long recognized that neglect statutes that allow the state to intervene on a child's behalf are remedial and "should be liberally construed to enable the court to carry out its obligations as *parens patriae*." *In re S.G.*, 581 A.2d 771, 778 (D.C.1990). The purpose of the state's intervention as *parens patriae* is to promote the child's best interest, which this court has sometimes characterized as "paramount." *In re S.K.*, 564 A.2d 1382, 1387 (D.C.1989) (Schwelb, J., concurring in part and dissenting in part).

This requirement to consider the "best interest" of the child is dictated by the neglect statute, D.C.Code § 16–2320(a), which states that "[i]f a child is found to be neglected," the court may order any number of possible dispositions, "which will be in the best interest of the child."[10] We have noted that the best interest standard "does not contain precise meaning," and "given the multitude of varied factual situations which must be embraced by such a standard, it must of necessity contain certain imprecision and elasticity." *In re J.*

8. The father had opposed the order that he undergo psychological testing, asserting that his mental competence had never been raised as an issue in this case, that the government was on a "fishing expedition," and that "there is no showing that he is an unfit parent and there is no basis to have a mental health evaluation of him." The government argued, among other things, that the father's anger management issues justified the request.

9. Specifically, the father argues that he was denied a probable cause hearing, that he was denied the right to offer testimony, that the court's decision to place the children in shelter care was legal error and factually unsup-

ported, and that the court's finding that the government made reasonable efforts to prevent placement of the children outside the home was based on improper factors.

10. The possible dispositions include returning the child to the care of his parent or guardian, protective supervision, placing the child with a third-party provider (including an agency facility or foster care), commitment of the child to a treatment facility, termination of the parental rights and adoption, or any other disposition permitted by law that serves the best interests of the child. D.C.Code § 16–2320(a).

S. R., 374 A.2d 860, 863 (D.C.1977) (citations omitted); *see also In re N. M. S.,* 347 A.2d 924, 927 (D.C.1975) (stating that "best interest is hardly an expression of precise meaning"). "[T]he standard 'best interest of the child' requires the judge, recognizing human frailty and man's limitations with respect to forecasting the future course of human events, to make an informed and rational judgment, free of bias and favor, as to the least detrimental of the available alternatives." *In re J. S. R.,* 374 A.2d at 863 (citing *In re Adoption of Tachick,* 60 Wis.2d 540, 210 N.W.2d 865 (1973)).

The trial court's power to commit children to the care of CFSA in order to protect their best interests is therefore broad. But it is not unbounded.

▮ As for the breadth of the court's power, it is true, for example, that the child's interest, not the parents' conduct, is the overriding concern in a neglect proceeding. "[W]e have recognized that the relevant focus for the court in neglect proceedings is the children's condition, not parental culpability." *In re T.G.,* 684 A.2d 786, 789 (D.C.1996) (citation and internal quotation marks omitted). It is also true that "[n]othing in the statute requires that a finding of neglect must first have been entered against a non-custodial parent before the court may order a disposition over that parent's objection." *In re S.G.,* 581 A.2d at 784; *see also In re J.W.,* 837 A.2d 40, 45–46 (D.C.2003) (stating that the trial court may still adjudicate the children neglected over the father's objection to the mother's stipulation because the focus of the court is the children's condition, not the father's culpability); *In re B.C.,* 582 A.2d 1196, 1198 (D.C.1990) ("The father's aversion to the potential personal implica-

tion of the court's finding that his children are neglected is not the relevant issue.").

Yet it is equally well established that what is in a child's best interest is informed by venerable principles that recognize a natural parent's right to develop a relationship with his child. These principles have compelled this court to conclude that a parental preference long recognized in cases involving termination of parental rights also applies to the temporary placement of a neglected child under D.C.Code § 16–2320. *See In re S.G.,* 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring) ("There can be no doubt that the presumption applies.");[11] *In re J.F.,* 615 A.2d 594, 598 (D.C.1992) (reaffirming that the parental preference applies to temporary custody orders). We have also held that in order to overcome the parental preference in a neglect proceeding, a trial court must find by clear and convincing evidence that the best interest of the child would be better served if placed elsewhere. *Id.* at 598 (finding that the trial judge violated a father's statutory and due process rights in part by failing to make an "express finding, . . . by clear and convincing evidence, that the father was unfit"); *In re C.L.O.,* 41 A.3d 502, 512 (D.C.2012) (stating, in an adoption case, that "[w]hen a fit, unwed, noncustodial father has seized his opportunity interest, his resulting right to presumptive custody 'can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons'") (quoting *In re S.M.,* 985 A.2d 413, 417 (D.C.2009)); *In re S.G.,* 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring) (noting that the same standard is applicable at the disposition in neglect pro-

11. Although some of the relevant sections of the opinion in *In re S.G.* appear in a concurrence, the court notes that "the concurring opinion represents the opinion of the court with respect to the issue addressed herein," 581 A.2d at 786 n. *, namely, the application of the parental presumption to fit noncustodial parents.

ceedings and at the point of termination of parental rights).[12]

The presumption is spelled out expressly in the neglect statute, which states that in abuse and neglect proceedings in the District of Columbia, it "shall be presumed that it is generally preferable to leave a child in his or her own home," D.C.Code § 16–2320(a), and which also precludes placing a child with a relative or other person without a finding that "the child cannot be protected in the home and there is an available placement likely to be less damaging to the child than the child's own home." D.C.Code § 16–2320(a)(3)(C). The statute thus "incorporate[s] the basic principle underlying the parental preference, namely, that a child's best interests usually will be to be in the custody of his or her natural parent or parent." *In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J. concurring); *see also In re S.K.*, 564 A.2d 1382, 1390 (D.C.1989) (Schwelb, J. concurring in part and dissenting in part) (stating that the "child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit") (citation omitted).

██ In addition to its statutory footing, the parental presumption has roots in the U.S. Constitution. The Supreme Court has recognized the constitutional protections afforded to parents to "establish a home and bring up children," *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), to "direct the upbringing and education of children," *Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534, 45 S.Ct.

571, 69 L.Ed. 1070 (1925), and to direct the "care, custody, and management of their child," *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This court has made clear that a noncustodial father has a "constitutionally protected 'opportunity interest' in developing a relationship with his child." *See, e.g. Appeal of H.R.*, 581 A.2d 1141, 1143 (D.C. 1990) (per curiam) (citing *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)); *In re J.F.*, 615 A.2d at 597. Accordingly, "an unwed father who demonstrated a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child ... acquires substantial protection under the Due Process Clause." *In re J.F.*, 615 A.2d at 597 (citation and internal quotation marks omitted). Having expressed concern that "temporary placement of a neglected child can substantially interfere with a natural parent's right to develop a relationship with a child," this court has recognized that there are "important reasons" that "the procedural protection of the Due Process Clause should extend to disposition proceedings involving the placement of a neglected child pursuant to D.C.Code § 16–2320." *In re J.F.*, 615 A.2d at 598 (citing *In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring)).

### 2. The Parental Presumption in Analogous Cases

On several occasions this court has considered noncustodial fathers' challenges to the commitment of their children after ne-

---

**12.** As noted in the concurring opinion in C.L.O., "there are noncustodial fathers who do care—who care deeply," and "our justice system, not knowing in advance who they are, should operate in every case as though one's fatherhood matters to him, both for the sakes of all the individuals involved and for the public's confidence that justice is being ac-complished." 41 A.3d at 518–19 (Ferren, J., concurring in the result); *see also Stanley v. Illinois*, 405 U.S. 645, 652, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("What is the state interest in separating children from fathers without a hearing designed to determine whether the father is unfit in a particular disputed case?").

glect findings stemming from abuse or neglect occurring in the mother's home. This precedent demonstrates the importance of explicit and genuine accommodation of the parental presumption at the disposition stage of neglect proceedings in cases involving fit parents who have been involved in the lives of their children prior to the neglect adjudication.

*In re J.F.*, 615 A.2d 594, is perhaps the closest to the circumstances in the present case. There, an unwed father sought custody of his son when neglect proceedings were initiated against the child's mother and the mother subsequently stipulated that the child was neglected. *Id.* at 595. The father was not the custodial parent at the time of government involvement, but had substantially supported the child throughout his life. *Id.* The trial court rejected the father's request for custody of the child and ordered that custody be given to the child's grandmother, at whose house the child had lived for much of his life, usually with his mother. *Id.* This court reversed the orders granting custody to the grandmother and remanded to the trial court for further proceedings, noting that the judge "did not acknowledge, much less address, the presumption in favor of a fit parent" and that "[n]o express finding was made, by clear and convincing evidence, that the father was unfit." *Id.* at 598 (citing *In re N. M. S.*, 347 A.2d 924, 927 (D.C.1975)). The court also held that the trial court's refusal to consider the rights of the adult parties in determining the best interest of the child "fail[ed] to recognize the constitutionally protected interest at stake." *In re J.F.*, 615 A.2d at 598.

In a similar case, *In re S.G.*, 581 A.2d 771, a child was adjudicated to have been neglected by her mother and stepfather after she was sexually abused by her stepfather. The child's natural father appealed the trial court's decision to grant custody to the child's maternal grandmother. Noting "the reality that such [temporary custody] orders may effectively become permanent as a result of the delays attendant to litigation and appeal," the court held that the parental presumption must apply to the temporary placement of children and the trial judge must develop "transitional arrangements aimed at reuniting the child to his or her natural parent or parents whenever a temporary custody order placing the child in the custody of a nonparent is required." *Id.* at 786–87 (Rogers, C.J., and Ferren, J., concurring). The court concluded that the father in that case was not entitled to the parental presumption, however, because he had failed to grasp his opportunity interest by ceding custody of the child to the mother and never seeking to regain it prior to the neglect finding. Had the father *not* relinquished his opportunity interest, this court stated, the trial court "would have an insufficient factual basis for determining where S.G.'s best interest lay" because "the judge never made any findings regarding the father's fitness." *Id.*

This court again grappled with a placement decision appealed by a fit noncustodial father in *In re L.J.T.*, 608 A.2d 1213 (D.C.1992). In that case, the mother, "previously found unfit, had reclaimed her suitability as custodian sufficient to be entrusted with her child under court supervision." *Id.* at 1216. The case therefore involved the respective interests of a fit noncustodial father and a custodial mother who had demonstrated her fitness, rather than a fit parent's challenge to an order granting custody to a nonparent or committing his children to the state's custody. This court upheld the child's placement with the mother, noting that the trial court "took proper account of [the father's] status as a fit, non-custodial natural father" and "explicitly addressed [his fitness] in the home study before the court." *Id.*

Thus, where the father "received notice, an opportunity to be heard, and ample consideration at the hearings, the judge's decision, supported by substantial evidence, to place the child with the natural mother did not violate [the father's] constitutional rights." *Id.*

■ These decisions establish that a parental presumption applies in temporary custody decisions just as in permanent orders and must be given significant weight. *See In re J.F.*, 615 A.2d at 598; *In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring). Our case law also firmly establishes that when a fit parent [13] exercises his or her opportunity interest,[14] the trial court can deem that preference rebutted only by clear and convincing evidence that the best interest of the child would be better served if the child were placed elsewhere. *In re J.F.*, 615 A.2d at 598; *In re S.G.*, 581 A.2d at 781, 785; *id.* at 786 (Rogers, C.J., and Ferren., J., concurring). Finally, the trial court must afford the noncustodial parent due process, including

notice, an opportunity to be heard, and full consideration supported by substantial evidence. *In re L.J.T.*, 608 A.2d at 1216.

## 3. The Role of the Parental Presumption at the Disposition

■ If this case had arisen in another state, the trial court's flexibility in crafting the disposition may have been more limited. Neighboring Maryland, for example, prohibits the long-term commitment of children to a third party when the allegations of neglect are sustained against only one parent and the other parent is able and willing to care for the children. Md. Code Ann., Cts. & Jud. Proc. § 3–819 (West 2001). "A child who has at least one parent willing and able to provide the child with proper care and attention should not be taken from both parents and be made a ward of the court." *In re Russell G.*, 108 Md.App. 366, 672 A.2d 109, 116, 114 (1996); *see also In re Sophie S.*, 167 Md.App. 91, 891 A.2d 1125, 1133 (2006).[15] In the District of Columbia, however, it is clear that

---

**13.** The District of Columbia applies a broad and flexible definition of fitness, recognizing "many varying degrees of fitness." *In re N. M. S.*, 347 A.2d at 927; *see also Appeal of H.R.*, 581 A.2d at 1178 (suggesting mental illness, violence, "serious emotional problems," and "history of alcohol abuse and an inability to hold jobs" as justifications for a finding of unfitness). *Cf. Estate of Williams*, 922 S.W.2d 422, 425 (Mo.Ct.App.1996) ("It appears that 'unfit' is given a broad definition in child custody matters and courts are given considerable discretion in applying that term."). Other states have employed a variety of judicially crafted definitions. *See, e.g., Petition of New England Home for Little Wanderers*, 367 Mass. 631, 328 N.E.2d 854, 863 (1975) ("grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard"); *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204, 210 (1990) ("a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-

being"); *In Interest of Kerns*, 225 Kan. 746, 594 P.2d 187, 193 (1979) (surveying the various definitions of unfitness used by Kansas courts).

**14.** *Appeal of H.R., supra,* contains a comprehensive discussion of what it means for a noncustodial parent to have "grasped the opportunity interest." 581 A.2d at 1159–65.

**15.** The parameters of other states' jurisdiction in circumstances in which a noncustodial parent seeks custody are discussed in Angela Greene, *The Crab Fisherman and His Children: A Constitutional Compass for the Non-Offending Parent in Child Protection Cases*, 24 Alaska L.Rev. 173, 181–88 (2007); Leslie Joan Harris, *Involving Nonresident Fathers in Dependency Cases: New Efforts, New Problems, New Solutions*, 9 J.L. & Fam. Stud. 281, 304–06 (2007); and Vivek S. Sankaran, *Parens Patriae Run Amuck: The Child Welfare System's Disregard for the Constitutional Rights of Nonoffending Parents*, 82 Temp. L.Rev. 55, 70–77 (2009).

the neglect statute "does not require the court to place a child with his or her natural parents," *In re J.F.*, 615 A.2d at 598, and that "[t]here conceivably can be circumstances in which clear and convincing evidence will show that an award of custody to a fit natural parent would be detrimental to the best interests of the child." *Appeal of H.R.*, 581 A.2d at 1178.

■ Our task is to determine whether the trial court, in rejecting the father's request for custody of his six children and committing them to the care of CFSA, adequately considered the parental presumption recognized in our decisions and in the District of Columbia Code.[16]

While the associate judge reviewing the magistrate judge's adjudication acknowledged the existence of "a preference toward placing children with their natural parents," neither judge based the decision to commit the children upon any finding that the father failed to grasp his opportunity interest, that he was unfit, or that there was clear and convincing evidence that it was in the children's best interest to be placed with someone other than their father. And the record in this case, with its many unanswered questions and yet-to-be-investigated facts, does not demonstrate that the court could have readily made such findings. On the contrary, the

indications in the record that the father had been involved in his children's lives, that the children spent weekends with him, that they viewed themselves as having two homes, and that they felt safe with their father at least hint that he was not incapable of taking care of them. *See In re J.F.*, 615 A.2d at 598–99 (noting that the record in that case did not compel a finding that the father was unfit to have custody of his child, and "[i]f anything it suggests the contrary (a matter for trial court consideration on remand)").

At the outset, proper recognition of the parental presumption requires more than a verbal allowance that the presumption exists. This court "has expressly acknowledged the importance of assuring that the trial court 'explicitly recognized and accommodated the existence of [the parental] presumption.'" *In re J.F.*, 615 A.2d at 598 (quoting *In re S.G.*, 581 A.2d at 785). When a court is deciding whether the presumption applies and whether there are grounds for rebutting it, it should base these decisions on a record worthy of the weight of this decision.

■ In neglect proceedings, counsel for the government has the "responsibility in the first instance to take the trouble to investigate the overall family situation and

---

16. While we recognize that our review is of the associate judge's order affirming the magistrate judge, rather than the ruling of the magistrate judge, "we do not believe our powers of appellate review are so limited that, in reviewing the trial court's final order we may not look to the findings and conclusions of the fact finder on which that ruling is based." *In re C.A.B.*, 4 A.3d 890, 902 (D.C.2010); *see also id.* at 902–903 ("A contrary conclusion would create the need for countless remands, consuming time and judicial resources, in cases like the present one, where a magistrate has painstakingly reviewed the record and made comprehensive findings and conclusions, and an associate judge succinctly affirms."). In conducting this review of the trial court's orders in neglect proceedings, we employ an abuse-of-discretion standard and evaluate whether the trial court "exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factor." *In re Baby Boy C.*, 630 A.2d 670, 673 (D.C.1993) (citing *In re R.M.G.*, 454 A.2d 776, 790 (D.C.1982)). "We then evaluate whether the decision is supported by substantial reasoning, drawn from a firm factual foundation in the record." *In re D.I.S.*, 494 A.2d 1316, 1323 (D.C.1985) (citations omitted). We review de novo the legal question whether the trial court applied the proper legal standard. *See In re C.L.O.*, 41 A.3d at 510; *Davis v. United States*, 564 A.2d 31, 35 (D.C.1989) (en banc).

present an adequate evidentiary picture," a burden that is "commensurate with the gravity of the petition for intervention in the lives of parent and child that the [government] files." *In re A.H.*, 842 A.2d 674, 685 n. 16 (D.C.2004). And while the GAL and the lawyers for the parties share this responsibility, the court "ought not to be passive in the face of what it recognizes is a deficient presentation of evidence" and should instead "take affirmative steps to ensure that it has enough evidence before it to make an informed decision." *Id.* (quoting *In re M.D.*, 758 A.2d 27, 34 (D.C. 2000)). Here, while the magistrate judge was presented with a difficult task of weighing conflicting interests in a case involving six abused children and some extenuating circumstances, we are not convinced that the magistrate judge or the associate judge applied the parental presumption at the disposition stage of these proceedings.

At the disposition hearing, the father made repeated requests for custody of his children, insisted that he was able to care for them, and emphasized the absence of evidence that he had neglected his children or that he was unfit. He also raised procedural challenges, claiming, most notably, that he had a lack of notice of, and a lack of adequate opportunity to respond to, the government's allegations that the children had suffered from dental neglect, which had not been part of the initial petition or the neglect adjudication. *Cf. In re J.F.*, 615 A.2d at 598 (finding the rights of the noncustodial father were violated where, among other things, he was not given the required notice that a court proceeding would be a dispositional hearing). In response, the government, the GAL, and the court at times acknowledged the significance of keeping neglected children in their homes but accorded no real weight to the father's presumptive right to care for his children.

The thrust of the magistrate judge's ultimate ruling, which adopted the government's arguments regarding the placement of the children, was that there was not enough information to allow the children to remain with their father. The government opposed placing the children with their father, and instead asked for commitment, because "we are actually in the same place we were when the children were removed," meaning that "[t]here is still very little information known about Mr. M.," and that the government still had concerns about the father's health and the adequacy of his housing. Instead of recognizing the presumption that a parent acts in his children's best interest, taking evidence on disputed matters of consequence, and requiring the government to overcome the parental presumption with clear and convincing evidence *that it would not be in the children's best interest* to be with their father, the magistrate judge treated the lack of information as a reason to place the children in the care of someone other than their father. The magistrate judge then committed the children to CFSA "based on all the information presented"—which, as we know, the government had characterized as "very little information." The associate judge's unadorned affirmance of the magistrate judge's disposition, which addresses the father's constitutional claim in a short discussion focusing primarily upon the order for supervised visitation, indicates that the father's right must yield to his children's best interest, but does not specify how the evidence in this case defeated the father's parental presumption.

Two factors that were the focus of much discussion at the disposition, the father's housing and his health, warrant particular mention. Throughout these proceedings the government opposed placing the children with the father—or even granting the father unsupervised visitation with his children—based in part upon its concern that

the father did not have enough space in his home to accommodate the children and that his lung condition made it impossible for him to care for six active children. These are legitimate considerations under D.C. law, and each could be a relevant factor in the determination whether the government presented clear and convincing evidence that it was in the children's best interest to be placed with someone besides their father.[17]

The main problem with any serious reliance upon the father's purportedly inadequate housing and ill health, however, was that neither was well substantiated at the time of the disposition hearing. The government and the GAL gave great weight to the observation that the father remained sitting throughout a supervised visit with his children, that his lung condition required him to carry an oxygen tank, and that his apartment only contained two or three bedrooms. Yet these proffers hardly constitute a sufficient factual basis for deeming the father to be an unsuitable placement for the children.

And even if the government had established more definitively that the father's home was too small for six children and that his health was an impediment to his parenting, our cases have cautioned against too heavy reliance upon factors of this nature when making decisions that result in the removal of children from the custody of a parent. As "a parent's poverty, ill health, or lack of education or sophistication, will not alone constitute grounds for termination of parental rights," *In re J.G.*, 831 A.2d 992, 1000–01 (D.C.2003) (emphasis added), nor should these factors be dispositive in a hearing that can have potentially permanent consequences.[18] *See In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring). That is particularly true in this case, where prior to the children's removal from their mother's home, the father had no reason to have a home large enough to accommodate all the children as full-time residents.[19] The court's decision to commit these children based in part upon inconclusive contentions of this nature reinforces our sense that it overlooked the parental presumption in its determination of what was in the children's best interest.

### B. The Initial Hearing and the Reasonable Efforts Requirement

Our view that the court failed to apply the parental presumption at the disposition

---

17. Indeed, two statutes in related family law contexts specifically support consideration of parental health. D.C.Code § 16–2353, which sets forth factors to consider when evaluating a termination of parental rights petition, lists "the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child." D.C.Code § 16–2353(b)(2). And D.C.Code § 16–914 includes "the mental and physical health of all individuals involved" in a best interest calculation as it relates to custody determinations outside of the abuse and neglect sphere. D.C.Code § 16–914(3)(E).

18. "[O]ur child neglect statute ... was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy." *In re J.G.*, 831 A.2d at 1000 (quoting *In re T.W.*, 732 A.2d 254, 262 (D.C.1999)).

19. In any event, we have routinely held that "[f]amily poverty is not a reason, in and of itself, to find a child neglected, even if it plausibly could be argued that the child's best interests would be served by removal to a materially wealthier home." *In re A.H.*, 842 A.2d 674, 687 (D.C.2004). Instead, "[w]hen it is poverty alone that causes an otherwise fit parent to be unable to care for her child, adequate public or private benefits should and will be made available to the family[.]" *Id.*

stage of this case is bolstered by a review of events that preceded the hearing at which the magistrate judge committed the children to CFSA. Though our decision to remand this case for reconsideration of the disposition decision obviates our formal consideration of the father's claim that he was deprived of his due process rights at the initial hearing,[20] early events in this case shed light upon the court's subsequent disposition and seemed to set the stage for the continuing inattention to the father's presumptive right to the care of his children.

Two statutes make clear that the rights of parents carry significant weight at the point of the initial shelter care determination. The first, D.C.Code § 16–2310(b), states that before a child can be placed in shelter care prior to a factfinding or dispositional hearing, it must be clear that shelter care is required "(1) to protect the person of the child" or "(2) because the child has no parent, guardian, custodian, or other person or agency able to provide supervision and care for him, and the child appears unable to care for himself," *and* that "(3) no alternative resources or arrangements are available to the family that would adequately safeguard the child without requiring removal." D.C.Code § 16–2310(b). The second, D.C.Code § 16–2312, requires the family court to determine whether "(A) [r]easonable efforts were made to prevent or eliminate the need for removal, or, in the alternative, a determination that the child's removal from the home is necessary regardless of any services that could be provided to the child or the child's family; and (B) continuation of the child in the child's home would be contrary to the welfare of the child."

D.C.Code § 16–2312(d)(3). These statutes require the government to make a showing that the children's placement in shelter care was the only available option to protect the children.

We recognize, as an initial matter, that the mother's waiver of a probable cause hearing and her stipulation that the children were neglected had the curious effect of turning the trial court's focus away from the children's father—in some ways legitimately, as "the relevant focus for the court in neglect proceedings is the children's condition, not parental culpability." *In re T.G.*, 684 A.2d 786, 789 (D.C.1996) (citation and internal quotation marks omitted). We also cannot reasonably fault the government for any initial failure to contemplate placing the children directly with their father upon their removal from their mother's home. CFSA had reason to believe one or more of the children were being physically abused, and all it knew about the children's father was that he had been admitted to a hospital and that no one seemed to know which one.

Yet from the very outset of this case, and at every turn, the father presented himself as the best placement option for the children and urged the magistrate judge to grant him custody of his children. When the court denied these requests, he filed a motion to reconsider, and when the court denied that motion, he asked for custody under protective supervision. At the initial hearing, when the father was out of the hospital and available to care for the children, his attorney's very first statement was to ask that the children be released into the father's care. The magistrate judge still found that "the efforts

---

**20.** We note, in addition, that the father's appellate counsel essentially acknowledged at oral argument what the government also emphasized in its brief—namely, that the father's challenges to the initial hearing were rendered moot by the disposition order. Our disposition in this case likewise makes it unnecessary for us to address the father's challenge to the imposition of supervised visitation, as any additional factfinding on remand may affect matters of visitation.

made with this family to prevent removal were in fact reasonable"[21] but then specified somewhat differently in the initial hearing order that due to the extraordinary circumstances—namely, the injury to P.S.'s eye, the risk that P.S.'s siblings would also be abused, and the initial inability to locate the father—"the fact that no reasonable efforts were made is hereby deemed reasonable."

While these findings may satisfy the reasonable efforts requirement of D.C.Code § 16–2312(d)(3), it is not clear that they address D.C.Code § 16–2310's prohibition on placing a child in shelter care unless there is *no parent* able to provide supervision *and no alternative resources* that can be made available to safeguard the children. In this regard, the government appeared to downplay and then delay confirming the father's, mother's, and children's assertions that the father lived separately from the family—a claim that was critical to the father's request for custody of his children and that the trial court refused to accept without further investigation by CFSA. The government also questioned both the mother's and father's insistence that one of the children, K.M., was already living at her father's home at the time of the children's removal, that her name was on her father's lease, and that her name was *not* on her mother's lease.[22] The father's attorney, asking that K.M. be returned to the care of her father and that he also be granted custody of the other children who lived with their mother, stated that "[t]here are no allegations against him in the petition" and "we're prepared to prove" that K.M. lived with her father.

To her credit, the magistrate judge, though finding the government's efforts reasonable, pressed the agency on many of these matters and urged it to investigate the father as a placement option. The court nonetheless agreed with the agency that "it would be contrary to the welfare of all of the children to return home at this time," noting that the agency needed more time to investigate this issue. These exchanges exemplify the government's mindset throughout the early stages of these proceedings—a mindset that resembled a presumption against the father rather than a recognition of his heightened interest in the placement of these children.

### III. Conclusion

As in *In re J.F.*, the father here "promptly and continuously asserted his right to custody of the child[ren]." 615 A.2d at 597 (citing *In re S.G.*, 581 A.2d at 783 n. 17). And also as in *In re J.F.*, the court did not apply the presumption in favor of a fit parent, did not make any express finding that the children's father was unfit, and did not have a record before it that adequately supported such a finding. 615 A.2d at 598–99; *cf. In re S.G.*, 581 A.2d at 787 (Rogers, C.J. and Ferren, J., concurring) (noting the trial court's "insufficient factual basis for determining where [the child's] best interest lay"). What is known from the record is

---

21. The judge based her finding upon the allegations in the complaint, the fact that CFSA had convened a family team meeting, the fact that the father was not "physically available at that time to serve as a resource," and the fact that the family had had prior contacts with CFSA. Counsel for the father disputed the significance of the prior contacts and argued that each of the referrals was either unfounded or inconclusive. The court considered the prior contacts while explicitly "not taking any position with respect to the outcomes in those cases" and without resolving the disputed issues.

22. When the government indicated at the initial hearing that the mother was receiving social security payments for K.M., the mother stated that this was not true and that she did not receive social security, while the father stated that he *did* receive social security and that he had K.M.'s papers at home.

that this father was involved in his children's lives, that they spent weekends together, that the children viewed themselves as having two different homes, that they felt safe with their father, that they "love[d] going to dad," and that the father's sister, who was the children's caretaker since they moved from the foster homes, viewed her brother as "a great father." At the disposition hearing, a social worker stated that the father's visits with his children were "going well," that there were "no problems or concerns," and that "everybody [was] enjoying visits." While the government leveled allegations regarding the father's anger management issues, his physical inability to care for the children, the children's dental neglect, and the family's history of contacts with CFSA, the magistrate judge "never made any findings regarding the father's fitness," *In re S.G.*, 581 A.2d at 787 (Rogers, C.J. and Ferren, J., concurring), stated that his health "may or may not be one factor to be considered," and made the decision to commit the children while leaving many factual disputes unresolved. In affirming the order committing the children, the associate judge likewise never characterized the father as unfit and never specified, if he was fit, what evidence justified the rebuttal of his right to presumptive custody of his children.

We conclude that the trial court applied an incorrect legal standard by failing to give meaningful weight to the parental presumption before it rejected the father's request for custody of his children and committed them to CFSA. We therefore reverse the trial court's order affirming that disposition and remand this case so that the trial court may incorporate the parental presumption into its analysis by determining whether the government has established by clear and convincing evidence either that the father is unfit or that awarding him custody would be detrimental to the best interest of the children.

*So ordered.*