# District of Columbia
## Court of Appeals



**No. 10-FS-1556**

IN RE: D.S.;

J.M., Appellant, **NEG334-10**

**No. 10-FS-1157**

IN RE: K.M.;

J.M., Appellant **NEG336-10**

**No. 10-FS-1558**

IN RE: B.S.;

J.M., Appellant **NEG337-10**

**No. 10-FS-1559**

IN RE: R.S.;

J.M., Appellant, **NEG338-10**

**No. 10-FS-1560**

IN RE: T.S.;

J.M., Appellant, **NEG339-10**

**No. 10-FS-1561**

IN RE: P.S.;

J.M., Appellant. **NEG340-10**

BEFORE: Washington, Chief Judge; Glickman, Fisher, Blackburne-Rigsby,*
Thompson, Beckwith,* Easterly, and McLeese, Associate Judges; Ferren,* Senior Judge.

## ORDER

On consideration of appellee's motion for an extension of time within which to file a petition for rehearing or rehearing *en banc*, appellee's motion for leave to file excess pages of appellee's lodged petition for rehearing or rehearing *en banc*, and appellant's opposition thereto, it is

ORDERED that appellee's motion for an extension of time within which to file a petition for rehearing or rehearing *en banc* is granted. It is

FURTHER ORDERED that appellee's motion for leave to file excess pages of appellee's lodged petition for rehearing or rehearing *en banc* is granted, and the Clerk shall file appellee's lodged petition for rehearing or rehearing *en banc*. It is

FURTHER ORDERED by the merits division* that the petition for rehearing is granted to the extent that the opinions issued by this court on September 20, 2012, 52 A.3d 887 (D.C. 2012), and February 21, 2013, 60 A.3d 1225 (D.C. 2013), are hereby vacated. It is

FURTHER ORDERED that appellee's petition for rehearing *en banc* is denied. It is

FURTHER ORDERED that the Clerk shall issue the accompanying opinion on this day, March 13, 2014.

PER CURIAM

Copies to:

Honorable Jeanette Jackson Clark

Clerk, Superior Court

Leslie J. Susskind, Esquire
1 Research Court, Suite 450
Rockville, MD  20850

Beverli B.V. Wynn-Euell, Esquire
1629 K Street, NW, Suite 300
Washington, DC  20006

Mindy Leon, Esquire
P.O. Box 162
Annandale, VA  22203

Todd S. Kim, Esquire
Solicitor General - DC

pii

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 10-FS-1556, 10-FS-1557, 10-FS-1558,
10-FS-1559, 10-FS-1560 & 10-FS-1561

IN RE D.S., K.M., B.S.,
R.S., T.S. & P.S.;

J.M., APPELLANT.

Appeals from the Superior Court
of the District of Columbia
NEG-334-10, NEG-336-10, NEG-337-10,
NEG-338-10, NEG-339-10 & NEG-340-10

(Hon. Lori E. Parker, Magistrate Judge)
(Hon. Jeanette Jackson Clark, Reviewing Judge)

(Argued March 8, 2012                    Decided September 20, 2012)

As Amended on Rehearing March 13, 2014

*Leslie J. Susskind*, appointed by the court, for appellant.

*Mindy Leon*, appointed by the court, Guardian ad Litem for appellees D.S., K.M, B.S., R.S., T.S. & P.S., filed a statement in lieu of brief.

*Beverli B.V. Wynn-Euell*, appointed by the court, for appellee V.S., filed a statement in lieu of brief.

*Dana K. Rubin*, with whom *Irvin Nathan*, Attorney General for the District of Columbia, and *Todd S. Kim*, Solicitor General, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and BECKWITH, *Associate Judges*, and FERREN, *Senior Judge*.

BECKWITH, *Associate Judge*: This case involves the ardent yet unsuccessful

effort of an unwed biological father of six children to keep these children after their mother's abuse of them led first to their removal from her home, then to her stipulation that they were neglected, and ultimately to their commitment to the District of Columbia Child and Family Services Agency (CFSA) over the father's objections. We concluded in an opinion issued after our initial hearing of this case that the trial court's determination that it was in these children's best interest to be committed to CFSA for up to two years failed sufficiently to take into account a fit parent's right to presumptive custody—a right that applies in temporary custody determinations in neglect proceedings as well as in cases involving the termination of parental rights. *In re J.F.*, 615 A.2d 594, 598 (D.C. 1992). We therefore reversed the trial court's order committing the children to CFSA and remanded to the trial court for reconsideration of the appropriate disposition under the correct legal standards. *See In re D.S.*, 52 A.3d 887 (D.C. 2012). On rehearing, we issued a separate opinion clarifying why our case law mandates the clear-and-convincing-evidence standard for the disposition—for temporary custody—in this neglect case. *See In re D.S.*, 60 A.3d 1225 (D.C. 2013).

On consideration of the government's second petition for rehearing, we now grant rehearing again and issue this amended opinion in place of the prior two

opinions in this case. We reiterate our holding—this time with additional explanation of its underlying rationale[1]—that the trial court failed to give real weight to the principles, well established in our cases and our law, that a "child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit," *In re S.G.*, 581 A.2d 771, 781 (D.C. 1990), that "it is generally preferable to leave a child in his or her own home," D.C. Code § 16-2320 (a) (2012 Repl.),[2] and that the right to presumptive custody of a fit, unwed, noncustodial father who has grasped the opportunity to be involved in his child's life can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with someone else.

## I. Factual and Procedural History

On June 1, 2010, CFSA received a hotline tip reporting that four-year-old P.S. had sustained an eye injury and had told staff at her school that her mother, V.S., had hit her in the face with a boot when P.S. would not stop crying. That

---

[1] The revisions appear primarily in Part II.A.1, Part II.A.2, and the Conclusion.

[2] All sections of the D.C. Code cited to in this opinion are to the 2012 Repl. version unless otherwise specified.

day, a CFSA social worker conducted interviews with P.S. and her five siblings—eleven-year-old K.M.; nine-year-old B.S.; R.S., who was two weeks shy of his eighth birthday; and six-year-old twins D.S. and T.S. The agency determined that immediate removal from the mother's home was necessary and placed the children in three different foster homes after P.S. told the social worker that "mommy hit [her] with a boot," K.S. reported that her mother "still hits [her]" and had previously punched her in the eye, several of the children stated that their mother hit them with a belt, and a medical examination revealed that P.S. had unexplained marks on her legs and scars on her buttocks that she said were caused by her mother hitting her with a broom. CFSA notified the mother that the children had been removed from her home and that a family team meeting would be held in two days, but the agency failed to locate the children's father, J.M. The mother and several of the children told the social worker that the father was in the hospital, but they did not know which hospital.

From the outset CFSA received information that the children's father did not live with the children at their mother's home but that he had a significant relationship with them. R.S. told the investigator that his father did not live at home, and K.M. added that the siblings stayed with their father every weekend,

Friday through Sunday. The children's mother also told the investigator that the father was involved with the children prior to his hospitalization. K.M., R.S., and B.S. each said that they felt safe with their father—R.S. specifically said "my daddy keeps me safe"—while B.S. said he "sometimes" felt safe with his mother and K.M. and R.S. said they did not feel safe with her.

In the two days following the children's removal, CFSA still failed to locate the father to notify him of the June 3, 2010, family team meeting. The father nevertheless found out about the meeting and participated over the telephone in the parties' discussion of the abuse and neglect allegations and the services that were available for the children.

Over the course of the next three months, the children's parents took part in four hearings pertaining to the neglect proceedings: the initial hearing on June 4, 2010, at which the government served the parents with petitions alleging that the children were neglected and the father acknowledged paternity of all six children; the pretrial hearing on July 30, 2010; the August 12, 2012, hearing at which the mother stipulated to the children's neglect and the magistrate judge adjudicated all six children to be neglected; and the disposition hearing on August 27, 2010, at which the court committed the children to the custody of CFSA for at least two

years. Throughout these proceedings, which were presided over by Superior Court Magistrate Judge Lori Parker, the father repeatedly requested immediate release of all six of his children into his custody.

At the initial hearing, which the father attended after having been released from the hospital that morning, a dispute immediately arose over the questions whether the father lived with the mother and children and, if he lived somewhere else, whether the eldest child, K.M., lived with him. Notwithstanding the children's unequivocal indications to the contrary during their interviews, the government's petition indicated—and the government maintained at the hearing— that the entire family lived together at the mother's home on Alabama Avenue.[3] Yet the Guardian ad Litem (GAL) noted that when she had spoken to R.S. and B.S. the night before the hearing, "they definitely spoke of two[] different homes." And with respect to K.M.'s address, although the GAL said that K.M. herself referred to her mother's house as "home," both parents indicated that she lived with her father and was listed on his lease, and the father's counsel said he was "prepared to prove" that she had been living with her father and asked that K.M. be returned to

---

[3] The petitions also stated that a CFSA social worker had been unable to speak with the father because she had not determined where he was hospitalized.

his care immediately. The magistrate judge did not take any evidence or resolve the dispute over where K.M. lived, but ordered the government to investigate the father's address. The government later amended the neglect petition to reflect the father's correct address.

Also at the initial hearing, the mother waived her right to a probable cause hearing. The father explicitly stated that he was not waiving a probable cause hearing, but did not object to the mother's waiver. The father's attorney argued that the government's efforts to prevent removal of the children were not reasonable because the father "was available to the agency for further investigation" even while hospitalized, "he is here today at the time that the Court is making the decision with respect to removal," and he "is ready, willing, and able to take care of the children." The magistrate judge found that, in light of the father's initial unavailability and the nature of P.S.'s injury, the government's efforts to prevent removal—efforts it was required by law to demonstrate—were reasonable.[4] Finally, over the father's strong objections, and despite the GAL's

---

[4] Our law requires the family court to determine whether the government made "reasonable efforts" to prevent removal of the child from the home. D.C. Code § 16-2312 (d)(3). Relatedly, D.C. Code § 16-2310 (b) states that a child cannot be placed in shelter care unless it is clear that shelter care is required to

(continued...)

statement that "the boys" told her "they love going to dad" and that "several of the children . . . express[ed] feeling safe with their father," the court adopted the government's recommendation that the father be allowed only supervised visitation with his children, stating that CFSA needed time "to determine that unsupervised visits would be in the children's best interest."

When the parties reconvened on July 30, 2010, for a pretrial hearing, the magistrate judge, who had in the interim already rejected the father's motion for reconsideration of the court's ruling rejecting his request for custody of his children, also rejected the father's renewed request for liberal unsupervised visitation. The court did so in "an abundance of caution" after the government and the GAL expressed concerns about the father's health and the children's extensive tooth decay. The father's counsel objected to the lack of notice and opportunity to respond to new allegations that both parents had neglected the children's dental health,[5] and complained that the government's requests to restrict the father's

---

(...continued)
protect the child or because he has no parent or other person to care for him and "no alternative resources or arrangements are available to the family that would adequately safeguard the child without requiring removal." The reasonable efforts requirement is discussed in further detail *infra* at 37-38.

[5] In the parties' joint pretrial statement, the GAL contended that the parents
(continued...)

parental rights should be based on "more than just the fact that they have concerns" and the government should have to present "facts upon which the Court can rest its ruling." The government responded that it was important for the judge to have "a total mosaic of what's been going on in this family" and "all information that it deems necessary in order to make a decision as to whether or not these children have been abused or neglected."

On August 12, 2010, the magistrate judge accepted the mother's stipulation of neglect as to each of the children and adjudicated all six children neglected. The father attended the proceeding and did not object.

The disposition hearing was held on August 27, 2010. The government and GAL recommended commitment of the children to CFSA with a goal of reunification by June 1, 2011. By this point, the children had for several weeks

_____

(...continued)
"failed to provide proper parental care necessary to protect the health of their children," specifically noting the children's need for treatment for serious tooth decay. Arguing that this was "a whole new topic of neglect" "only two weeks away from trial," the father asked that the court order the government to proceed to trial on the original petitions. After a discussion of the necessity to formally amend the petition, the government informed the parties on the record that the petition now included charges relating to dental neglect. The petitions were never formally amended.

been living at the Maryland home of K.V., the children's paternal aunt and foster care provider, and the government asked the magistrate judge to maintain the supervised visitation arrangement. The government and GAL continued to oppose granting custody of the children to the father—including the father's latest request that the children be released to him under protective supervision—based upon ongoing concerns about the father's lung disease,[6] his problems controlling anger,[7] and the adequacy of his home,[8] and upon the government's view that "[t]here is

---

[6] Throughout these proceedings, the government and GAL raised concerns about the father's lung condition and the fact that he remained seated during at least one of his supervised visits with his children. The father's attorney disputed a claim in a pretrial report that the father had to be hospitalized monthly, asserting that his lung condition was under control, that he was capable of "actively parenting his children," and that it was appropriate to remain seated during visits in which everyone else was seated. With respect to the government's concerns about his "ability to monitor such active kids," the father himself stated that "we go walking," "we go to the store or the playground" that was right outside his door, and "I have all day to watch them play."

[7] The GAL stated, for example, that she had witnessed some "anger management problems," including a voice message the father left for his sister, K.V., in which he used profanity when referring to the children. K.V. called the outburst "an isolated incident" and stated that her brother had not used profanity in front of the children.

[8] The government objected to the father's request for release of his children under protective supervision based in part upon concern "as to whether or not [the father's] current housing situation would support all six of the children." While a social worker had visited the father's apartment, Della Hoffman, the ongoing social worker on the case, stated at the disposition hearing that she had not been to the

(continued...)

still very little information known about Mr. M."

Acknowledging the concerns that had been expressed regarding the father's health and the adequacy of space in his apartment, the magistrate judge committed the children to the care of CFSA for a period not to exceed two years with the future goal of reunification with a parent, denied again the father's request for unsupervised visitation, and ordered the father to submit to a mental health evaluation.[9] The father filed a motion for review of the shelter care order, the visitation order, and the disposition, and on November 29, 2010, Associate Judge Jeannette Clark issued an order affirming the decision of the magistrate judge. The father now appeals from that order.

---

(...continued)
father's apartment but that she "believe[d]" it was "a two or a three bedroom" apartment. Almost three months after the children's removal from their mother's home, the government still claimed to have insufficient information to allow the father to have unsupervised visits, no less custody of his children. For his part, the father stated at the hearing that he had "taken care of [his] kids before we came into this court system."

[9] The father had opposed the order that he undergo psychological testing, asserting that his mental competence had never been raised as an issue in this case, that the government was on a "fishing expedition," and that "there is no showing that he is an unfit parent and there is no basis to have a mental health evaluation of him." The government argued, among other things, that the father's anger management issues justified the request.

12

## II. Analysis

On appeal, J.M. challenges the trial court's order committing his children to CFSA in the absence of any proof that he was an unfit parent and, he claims, contrary to his constitutional due process rights and to the statutory presumption recognizing "that it is generally preferable to leave a child in his or her own home." D.C. Code §16-2320 (a). He also argues that the trial court abused its discretion in the way it conducted the initial hearing at which the court ordered the children to be placed in shelter care pending the disposition hearing,[10] and that it erred in imposing supervised visitation, particularly when he was not involved in the physical abuse that led to their removal and when he routinely had the children at his home on weekends.

**A.    The Father's Challenge to the Children's Commitment to CFSA**

---

[10]    Specifically, the father argues that he was denied a probable cause hearing, that he was denied the right to offer testimony, that the court's decision to place the children in shelter care was legal error and factually unsupported, and that the court's finding that the government made reasonable efforts to prevent placement of the children outside the home was based on improper factors.

## 1.    Governing principles

We have long recognized that neglect statutes that allow the state to intervene on a child's behalf are remedial and "should be liberally construed to enable the court to carry out its obligations as *parens patriae*." *In re S.G.*, 581 A.2d 771, 778 (D.C. 1990). The purpose of the state's intervention as *parens patriae* is to promote the child's best interest, which this court has sometimes characterized as "paramount." *In re S.K.*, 564 A.2d 1382, 1388 (D.C. 1989) (Schwelb, J., concurring in part and dissenting in part).

This requirement to consider the "best interest" of the child is dictated by the neglect statute, D.C. Code § 16-2320 (a), which states that "[i]f a child is found to be neglected," the court may order any number of possible dispositions, "which will be in the best interest of the child."[11] We have noted that the best interest standard "does not contain precise meaning," and "given the multitude of varied factual situations which must be embraced by such a standard, it must of necessity

---

[11] The possible dispositions include returning the child to the care of his parent or guardian, protective supervision, placing the child with a third-party provider (including an agency facility or foster care), commitment of the child to a treatment facility, termination of the parental rights and adoption, or any other disposition permitted by law that serves the best interests of the child. D.C. Code § 16-2320 (a).

14

contain certain imprecision and elasticity." *In re J.S.R.*, 374 A.2d 860, 863 (D.C. 1977) (citations omitted); *see also In re N.M.S.*, 347 A.2d 924, 927 (D.C. 1975) (stating that "best interest is hardly an expression of precise meaning"). "[T]he standard 'best interest of the child' requires the judge, recognizing human frailty and man's limitations with respect to forecasting the future course of human events, to make an informed and rational judgment, free of bias and favor, as to the least detrimental of the available alternatives." *In re J.S.R.*, 374 A.2d at 863 (citing *In re Adoption of Tachick*, 210 N.W.2d 865 (Wis. 1973)).

The trial court's power to commit children to the care of CFSA in order to protect their best interests is therefore broad. But it is not unbounded.

As for the breadth of the court's power, it is true, for example, that the child's interest, not the parents' conduct, is the overriding concern in a neglect proceeding. "[W]e have recognized that the relevant focus for the court in neglect proceedings is the children's condition, not parental culpability." *In re T.G.*, 684 A.2d 786, 789 (D.C. 1996) (citation and internal quotation marks omitted). It is also true that "[n]othing in the statute requires that a finding of neglect must first have been entered against a non-custodial parent before the court may order a disposition over that parent's objection." *In re S.G.*, 581 A.2d at 784; *see also In*

*re J.W.*, 837 A.2d 40, 45-46 (D.C. 2003) (stating that the trial court may still adjudicate the children neglected over the father's objection to the mother's stipulation because the focus of the court is the children's condition, not the father's culpability); *In re B.C.*, 582 A.2d 1196, 1198 (D.C. 1990) ("The father's aversion to the potential personal implication of the court's finding that his children are neglected children is not the relevant issue.").

Yet it is equally well established that what is in a child's best interest is informed by venerable principles that recognize a natural parent's right to develop a relationship with his child. These principles have compelled this court to conclude that a parental preference long recognized in cases involving termination of parental rights also applies to the temporary placement of a neglected child under D.C. Code § 16-2320. *See In re J.F.*, 615 A.2d 594, 598 (D.C. 1992) (reaffirming that the parental preference applies to temporary custody orders); *In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring).

The presumption is spelled out expressly in the neglect statute, which states that in abuse and neglect proceedings in the District of Columbia, it "shall be presumed that it is generally preferable to leave a child in his or her own home," D.C. Code § 16-2320 (a), and which also precludes placing a child with a relative

or other person without a finding that "the child cannot be protected in the home and there is an available placement likely to be less damaging to the child than the child's own home." D.C. Code § 16-2320 (a)(3)(C). The statute thus "incorporate[s] the basic principle underlying the parental preference, namely, that a child's best interests usually will be to be in the custody of his or her natural parent or parent." *In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J. concurring); *see also In re S.K.*, 564 A.2d 1382, 1387 (D.C. 1989) (Schwelb, J. concurring in part and dissenting in part) (stating that the "child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit") (citation omitted).

In addition to its statutory footing, the parental presumption has roots in the U.S. Constitution. The Supreme Court has recognized the constitutional protections afforded to parents to "establish a home and bring up children," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), to "direct the upbringing and education of children," *Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925), and to direct the "care, custody, and management of their child," *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This court has made clear that a noncustodial father has a "constitutionally protected 'opportunity interest' in

developing a relationship with his child." *See, e.g. Appeal of H.R.*, 581 A.2d 1141, 1143 (D.C. 1990) (per curiam) (citing *Lehr v. Robertson*, 463 U.S. 248 (1983)); *In re J.F.*, 615 A.2d at 597. Accordingly, "an unwed father who demonstrated a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child . . . acquires substantial protection under the Due Process Clause." *Id.* at 597 (citation and internal quotation marks omitted). Having expressed concern that "temporary placement of a neglected child can substantially interfere with a natural parent's right to develop a relationship with a child," this court has recognized that there are "important reasons" that "the procedural protection of the Due Process Clause should extend to disposition proceedings involving the placement of a neglected child pursuant to D.C. Code § 16-2320." *Id.* at 598 (citing *In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring)).

## 2. The Parental Presumption in Analogous Cases

On several occasions this court has considered noncustodial fathers' challenges to the commitment of their children after neglect findings stemming from abuse or neglect occurring in the mother's home. This precedent demonstrates the importance of explicit and genuine accommodation of the

parental presumption at the disposition stage of neglect proceedings in cases involving fit parents who have been involved in the lives of their children prior to the neglect adjudication.

In *In re S.G.*, 581 A.2d 771, a child was adjudicated to have been neglected by her mother and stepfather after she was sexually abused by her stepfather. The child's natural father appealed the trial court's decision to grant custody to the child's maternal grandmother. Noting "the reality that such [temporary custody] orders may effectively become permanent as a result of the delays attendant to litigation and appeal," the court held—in a two-judge concurrence that constituted the opinion of the court on the issue of temporary custody[12]— that "[t]here can be no doubt that the [parental] presumption applies" to the temporary placement of children and the trial judge must develop "transitional arrangements aimed at returning the child to his or her natural parent or parents whenever a temporary custody order placing the child in the custody of a nonparent is required." *Id.* at

---

[12] Although some of the relevant sections of the opinion in *In re S.G.* appear in a concurrence, the court noted that "[t]he concurring opinion represents the opinion of the court with respect to the issue addressed herein," 581 A.2d at 786 n.*, namely, the application of the parental presumption to fit noncustodial parents.

786-87 (Rogers, C.J., and Ferren, J., concurring).

As for the standard of proof required to rebut this parental presumption, the two-judge majority concluded that the trial judge in that case had "properly proceeded" in applying the parental presumption, observing that the judge had "found by clear and convincing evidence that S.G.'s best interests for the immediate future lay in remaining" where she had always lived with her siblings and grandmother rather than with her father in another city.[13] *In re S.G.*, 581 A.2d at 786-87. Judge Schwelb stated for himself that "assum[ing], without deciding," that the presumption applied to a temporary placement of a neglected child, it had been "effectively rebutted" because the trial court had found it rebutted by clear and convincing evidence. *Id.* at 781; *see also id.* at 785 (concluding that the trial court's application of the clear-and-convincing-evidence standard accorded "the father's presumptive rights . . . the requisite consideration"). In converting Judge

---

[13] The court concluded that the father in that case was not entitled to the parental presumption because he had failed to grasp his opportunity interest by long ago surrendering custody of the child to the mother and never seeking to regain it prior to the neglect finding. Had the father *not* relinquished his opportunity interest, this court stated, the trial court "would have an insufficient factual basis for determining where S.G.'s best interest lay" because "the judge never made any findings regarding the father's fitness." *In re S.G.*, 581 A.2d at 786-87.

Schwelb's mere assumption into a holding that the parental presumption applies to temporary custody, the majority in *In re S.G.* did not explicitly discuss the evidentiary standard required for rebutting the presumption, although all three members of the panel acknowledged the trial court's use of the clear-and-convincing standard. In doing so, the court focused upon the lasting prejudice to a noncustodial parent once the child begins bonding with a different custodian—an insight that signified that the parental preference, when applied to a neglect disposition, incorporated the same clear-and-convincing-evidence standard that is so critical to forestalling such prejudice in the context of permanent custody decisions.

Two years later, in *In re J.F.*, 615 A.2d 594—perhaps the case that is closest to the circumstances in the present case—this court stated more directly what it strongly implied in *In re S.G.* In *In re J.F*, an unwed father sought custody of his son when neglect proceedings were initiated against the child's mother and the mother subsequently stipulated that the child was neglected. *Id.* at 595. The father was not the custodial parent at the time of government involvement, but had substantially supported the child throughout his life. *Id.* The trial court rejected the father's request for custody of the child and ordered that custody be given to

the child's grandmother, at whose house the child had lived for much of his life, usually with his mother. *Id.* This court reversed the orders granting custody to the grandmother and remanded to the trial court for further proceedings, noting that the judge had "fail[ed] to recognize the constitutionally protected interest at stake" when she stated "that she did not need to decide the rights of the adult parties, since the best interests of the child was the issue." *Id.* at 595, 598. Reviewing a litany of reasons the trial judge's order violated the father's statutory and due process rights, the court stated: "The judge also did not acknowledge, much less address, the presumption in favor of a fit parent. No express finding was made, by clear and convincing evidence, that the father was unfit." *Id.* at 598 (citation omitted). The court's decision in *In re J.F.* to construe "the presumption" at issue as a statutory presumption with constitutional underpinnings that could only be rebutted by a standard more stringent than a straightforward best-interest determination followed logically from *In re S.G.*[14]

---

[14] As our prior cases make clear, the parental presumption is inherent in the natural parent, subject to nullification by a government showing of unfitness. *See, e.g., In re S.M.,* 985 A.2d 413, 418-419 (D.C. 2009) (noting that the trial court did not "find that [the father] was unfit so as to negate by itself the presumption"); *id.* at 417 (noting that "application of the statute must take into account the presumption that the child's best interest will be served by placing the child with

(continued...)

This court again grappled with a placement decision appealed by a fit noncustodial father in *In re L.J.T.*, 608 A.2d 1213 (D.C. 1992). In that case, the mother, "previously found unfit, had reclaimed her suitability as custodian sufficient to be entrusted with her child under court supervision." *Id.* at 1216. The case therefore involved the respective interests of a fit noncustodial father and a custodial mother who had demonstrated her fitness, rather than a fit parent's challenge to an order granting custody to a nonparent or committing his children to the state's custody. This court upheld the child's placement with the mother, noting that the trial court "took proper account of [the father's] status as a fit, non-custodial natural father" and "explicitly addressed [his fitness] in the home study before the court." *Id.* Thus, where the father "received notice, an opportunity to be heard, and ample consideration at the hearings, the judge's decision, supported

---

(...continued)
his natural parent, provided the parent has not been proved unfit"). We do not, moreover, read the *J.F.* decision to require clear and convincing evidence of the father's unfitness—a question that is not, in any event, an issue in this appeal, and we express no opinion on the evidentiary standard for determining fitness. The standard we apply here, as stated in the context of an adoption case, is this: "When a fit, unwed, noncustodial father has seized his opportunity interest, his resulting right to presumptive custody 'can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons.'" *In re C.L.O.*, 41 A.3d 502, 512 (D.C. 2012) (quoting *In re S.M.*, 985 A.2d at 417).

by substantial evidence, to place the child with the natural mother did not violate [the father's] constitutional rights." *Id.*

These decisions establish that a parental presumption applies in temporary custody decisions just as in permanent orders and must be given significant weight. *See In re J.F.*, 615 A.2d at 598; *In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring). This case law also firmly establishes that when a fit parent[15] exercises his or her opportunity interest,[16] the trial court can deem that

---

[15] The District of Columbia applies a broad and flexible definition of fitness, recognizing "many varying degrees of fitness." *In re N.M.S.*, 347 A.2d 924, 927 (D.C. 1975); *see also Appeal of H.R.*, 581 A.2d at 1178 (suggesting mental illness, violence, "serious emotional problems," and "history of alcohol abuse and an inability to hold jobs" as justifications for a finding of unfitness). *Cf. Estate of Williams*, 922 S.W.2d 422, 425 (Mo. Ct. App. 1996) ("It appears that 'unfit' is given a broad definition in child custody matters and courts are given considerable discretion in applying that term."). Other states have employed a variety of judicially crafted definitions. *See, e.g., Petition of New England Home for Little Wanderers*, 328 N.E.2d 854, 863 (Mass. 1975) ("grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard"); *Ritter v. Ritter*, 450 N.W.2d 204, 210 (Neb. 1990) ("a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being"); *In Interest of Kerns*, 594 P.2d 187, 193 (Kan. 1979) (surveying the various definitions of unfitness used by Kansas courts).

[16] *Appeal of H.R., supra,* contains a comprehensive discussion of what it means for a noncustodial parent to have "grasped his opportunity interest." 581 A.2d at 1159-65.

preference rebutted only by clear and convincing evidence that the best interest of

the child would be better served if the child were placed elsewhere. *In re J.F.*, 615

A.2d at 598; *In re S.G.*, 581 A.2d at 781, 785; *id.* at 786 (Rogers, C.J., and Ferren.,

J., concurring).[17]  Finally, the trial court must afford the noncustodial parent due

---

[17] *In re J.F.* and *In re S.G.* did not put it in these terms, but in seeking to interpret the parental preference of D.C. Code § 16-2320 (a) in a way that ensures its constitutionality in the absence of an express statutory standard, we find in the principle of constitutional avoidance the justification for the presumption in our case law that a fit parent who has grasped his opportunity interest will be awarded temporary custody of his children absent clear and convincing evidence that placement with the CFSA is in the children's best interests. *See Mack v. United States*, 6 A.3d 1224, 1233-34 (D.C. 2010) ("[T]he canon of constitutional avoidance 'is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)); *accord Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). As our prior decisions have recognized, the time between the decisions on temporary and permanent custody can be substantial, and the considerable bonding between the third-party custodian and the child will almost inevitably give that custodian an advantage over the noncustodial father in a best interest analysis at the time permanent custody is determined. Under these circumstances, a serious constitutional problem arises with respect to whether a "clear and convincing" or a lesser preponderance standard should apply to a period of time that may seriously prejudice a fit parent's presumptive right to permanent custody in the event he is deprived of temporary custody. *See In re S.G.*, 581 A.2d at 786. Because it is typically not possible to discern the length of the interval between temporary and permanent custody at the time temporary custody is awarded, and it is therefore not possible to identify a constitutional limitation on the award of temporary custody

(continued...)

process, including notice, an opportunity to be heard, and full consideration supported by substantial evidence. *In re L.J.T.*, 608 A.2d at 1216.

The government has argued on rehearing that *In re S.G.* and *In re J.F.* could not overrule several earlier decisions that hold that the preponderance standard applies in neglect proceedings. None of the cases it cites, however, involves anything akin to the circumstances here, in which a noncustodial father who has a close ongoing relationship with his children, who was not the subject of the neglect petition, and who has not been found to be unfit asked the court to place those children with him.[18] Our use of the clear-and-convincing-evidence standard also does not conflict with *In re A.G.*, 900 A.2d 677 (D.C. 2006), where this court

---

(...continued)
in every case, the likelihood of a constitutional issue arising is nonetheless sufficiently strong that we should construe the statute by applying a policy that would assure its constitutionality—the clear and convincing standard when a fit natural father who has seized his opportunity interest seeks custody.

[18] *See In re B.K.*, 429 A.2d 1331, 1333 (D.C. 1981) (reviewing only the neglect adjudication, not the disposition, in a case in which both parents were neglectful); *In re N.H.*, 569 A.2d 1179, 1181-83 (D.C. 1990) (reviewing a mother's challenge to a neglect finding where no father was involved); *In re L.E.J.*, 465 A.2d 374, 375-377 (D.C. 1983) (same); *see also In re M.D.*, 602 A.2d 109, 115 n.17 (D.C. 1992) (reversing the denial of visitation rights to a father where both parents had stipulated to the child's neglect); *In re K.O.W.*, 774 A.2d 296, 304 (D.C. 2001) (reviewing an order depriving a father of any visitation with his sons).

26

held—well more than a decade after *S.G.* and *J.F.*—that the preponderance standard governed the determination of custody in a guardianship proceeding following a finding of neglect. This court accepted the preponderance standard rather than insisting on the clear and convincing evidence required by statute for proceedings that wholly terminate parental rights. We justified this ruling by pointing out that the entry of a guardianship order does not terminate many of the natural parents' important rights, such as the right to visitation, the right to determine the child's religious affiliation, and the right of the child to inherit from his parents. *Id.* at 681. But we drew this distinction in a context fundamentally unlike the one in this case. The father's challenge in *In re A.G.* was limited to his status as a natural father per se; it did not involve a request for custody by a fit parent who had grasped his opportunity interest—a status, potentially true in this case, entitling the father to the strong presumption of custody rebuttable only by clear and convincing evidence.[19] In sum, the critical distinction between this case

---

[19] In *In re A.G.*, this court expressly declined to reach, as unnecessary, the government's final argument that the father's opposition to the guardianship petition lacked merit because he was unfit and had not seized his opportunity interest. 900 A.2d at 682 n.8. One might argue that this court, in declining to address this argument, was drawing a bright line, announcing a preponderance standard for custody decisions in all neglect proceedings except for those proposing complete termination of parental rights. Yet because the court did not

(continued...)

and *In re A.G.* is the difference between a potentially fit father who may well have grasped his opportunity interest and one who has not satisfied these two criteria.

Notwithstanding the potential tension between *In re A.G.*'s holding and *In re S.G.* and *In re J.F.*'s approval of a more exacting standard of proof in particular neglect dispositions, the narrowness of the question before the court in *In re A.G.* makes that case fully reconcilable with the conclusion that where a noncustodial father who was not the subject of the neglect petition has satisfied the fundamental criteria justifying custody, the preponderance standard is insufficient to prevent the accelerating prejudice against his retention of parental rights once temporary

---

(...continued)
address, let alone come to grips with, the "fitness" and "opportunity" criteria central to our disposition here—criteria stressed years earlier in *In re S.G.* and *In re J.F.*—*In re A.G.* is not binding authority beyond the facts and issues it expressly addresses. It is worth noting that three years after *In re A.G.*, this court indicated that a clear-and-convincing-evidence standard may apply in other guardianship contexts. "We reiterate, that parents whose parental rights are intact do not lose the right to have their choice as to their child's adoption *or guardianship* being accorded substantial weight simply because they have not been model parents or have lost temporary custody of their children." *In re T.W.M.*, 964 A.2d 595, 601-02 n.6 (D.C. 2009) (emphasis added) (reversing trial court's denial of adoption petition of natural parents' chosen caregiver) (internal quotation marks omitted). *See also id.* at 602 (stating that a "parent's choice of a fit custodian for the child must be given *weighty consideration* which can be overcome only by . . . clear and convincing evidence" (quoting *In re T.J.*, 666 A.2d 1, 11 (D.C. 1995))) (emphasis added in *T.W.M.*).

custody is awarded to another party.

### 3. The Role of the Parental Presumption at the Disposition

If this case had arisen in another state, the trial court's flexibility in crafting the disposition may have been more limited. Neighboring Maryland, for example, prohibits the long-term commitment of children to a third party when the allegations of neglect are sustained against only one parent and the other parent is able and willing to care for the children. Md. Code Ann., Cts. & Jud. Proc. § 3-819 (West 2001). "A child who has at least one parent willing and able to provide the child with proper care and attention should not be taken from both parents and be made a ward of the court." *In re Russell G.*, 672 A.2d 109, 114 (Md. 1996); *see also In re Sophie S.*, 891 A.2d 1125, 1133 (Md. 2006).[20] In the District of Columbia, however, it is clear that the neglect statute "does not require the court to

---

[20] The parameters of other states' jurisdiction in circumstances in which a noncustodial parent seeks custody are discussed in Angela Greene, *The Crab Fisherman and His Children: A Constitutional Compass for the Non-Offending Parent in Child Protection Cases*, 24 Alaska L. Rev. 173, 181-88 (2007); Leslie Joan Harris, *Involving Nonresident Fathers in Dependency Cases: New Efforts, New Problems, New Solutions*, 9 J. L. & Fam. Stud. 281, 304-06 (2007); and Vivek S. Sankaran, *Parens Patriae Run Amuck: The Child Welfare System's Disregard for the Constitutional Rights of Nonoffending Parents*, 82 Temp. L. Rev. 55, 70-77 (2009).

29

place a child with his or her natural parents," *In re J.F.*, 615 A.2d at 598, and that "[t]here conceivably can be circumstances in which clear and convincing evidence will show that an award of custody to a fit natural parent would be detrimental to the best interests of the child." *Appeal of H.R.*, 581 A.2d at 1178.

Our task is to determine whether the trial court, in rejecting the father's request for custody of his six children and committing them to the care of CFSA, adequately considered the parental presumption recognized in our decisions and in the District of Columbia Code.[21]

___

[21] While we recognize that our review is of the associate judge's order affirming the magistrate judge, rather than the ruling of the magistrate judge, "we do not believe our powers of appellate review are so limited that, in reviewing the trial court's final order we may not look to the findings and conclusions of the fact finder on which that ruling is based." *In re C.A.B.*, 4 A.3d 890, 902 (D.C. 2010); *see also id.* at 902-903 ("A contrary conclusion would create the need for countless remands, consuming time and judicial resources, in cases like the present one, where a magistrate has painstakingly reviewed the record and made comprehensive findings and conclusions, and an associate judge succinctly affirms."). In conducting this review of the trial court's orders in neglect proceedings, we employ an abuse-of-discretion standard and evaluate whether the trial court "exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor." *In re Baby Boy C.*, 630 A.2d 670, 673 (D.C. 1993) (citing *In re R.M.G.*, 454 A.2d 776, 790 (D.C. 1982)). "We then evaluate whether the decision is supported by substantial reasoning, drawn from a firm factual foundation in the record." *In re D.I.S.*, 494 A.2d 1316, 1323 (D.C. 1985) (internal quotation marks and citations omitted). We review de novo the legal question whether the trial court applied the proper legal standard. *See In re*

(continued...)

While the associate judge reviewing the magistrate judge's adjudication acknowledged the existence of "a preference toward placing children with their natural parents," neither judge based the decision to commit the children upon any finding that the father failed to grasp his opportunity interest, that he was unfit, or that there was clear and convincing evidence that it was in the children's best interest to be placed with someone other than their father. And the record in this case, with its many unanswered questions and yet-to-be-investigated facts, does not demonstrate that the court could have readily made such findings. On the contrary, the indications in the record that the father had been involved in his children's lives, that the children spent weekends with him, that they viewed themselves as having two homes, and that they felt safe with their father at least hint that he was not incapable of taking care of them. *See In re J.F.*, 615 A.2d at 598-99 (noting that the record in that case did not compel a finding that the father was unfit to have custody of his child, and "[i]f anything it suggests the contrary (a matter for trial court consideration on remand)").

At the outset, proper recognition of the parental presumption requires more

_____

(…continued)
*C.L.O.*, 41 A.3d at 510; *Davis v. United States*, 564 A.2d 31, 35 (D.C. 1989) (en banc).

than a verbal allowance that the presumption exists. This court "has expressly acknowledged the importance of assuring that the trial court 'explicitly recognized and accommodated the existence of [the parental] presumption.'" *In re J.F.*, 615 A.2d at 598 (quoting *In re S.G.*, 581 A.2d at 785). When a court is deciding whether the presumption applies and whether there are grounds for rebutting it, it should base these decisions on a record worthy of the weight of this decision.

In neglect proceedings, counsel for the government has the "responsibility in the first instance to take the trouble to investigate the overall family situation and present an adequate evidentiary picture," a burden that is "commensurate with the gravity of the petition for intervention in the lives of parent and child that the [government] files." *In re A.H.*, 842 A.2d 674, 685 n.16 (D.C. 2004). And while the GAL and the lawyers for the parties share this responsibility, the court "ought not to be passive in the face of what it recognizes is a deficient presentation of evidence" and should instead "take affirmative steps to ensure that it has enough evidence before it to make an informed decision." *Id.* (quoting *In re M.D.*, 758 A.2d 27, 34 (D.C. 2000)). Here, while the magistrate judge was presented with a difficult task of weighing conflicting interests in a case involving six abused children and some extenuating circumstances, we are not convinced that the

magistrate judge or the associate judge applied the parental presumption at the disposition stage of these proceedings.

At the disposition hearing, the father made repeated requests for custody of his children, insisted that he was able to care for them, and emphasized the absence of evidence that he had neglected his children or that he was unfit. He also raised procedural challenges, claiming, most notably, that he had a lack of notice of, and a lack of adequate opportunity to respond to, the government's allegations that the children had suffered from dental neglect, which had not been part of the initial petition or the neglect adjudication. *Cf. In re J.F.*, 615 A.2d at 598 (finding the rights of the noncustodial father were violated where, among other things, he was not given the required notice that a court proceeding would be a dispositional hearing). In response, the government, the GAL, and the court at times acknowledged the significance of keeping neglected children in their homes but accorded no real weight to the father's presumptive right to care for his children.

The thrust of the magistrate judge's ultimate ruling, which adopted the government's arguments regarding the placement of the children, was that there was not enough information to allow the children to remain with their father. The government opposed placing the children with their father, and instead asked for

commitment, because "we are actually in the same place we were when the children were removed," meaning that "[t]here is still very little information known about Mr. M.," and that the government still had concerns about the father's health and the adequacy of his housing. Instead of recognizing the presumption that a parent acts in his children's best interest, taking evidence on disputed matters of consequence, and requiring the government to overcome the parental presumption with clear and convincing evidence that it would not be in the children's best interest to be with their father, the magistrate judge treated the lack of information as a reason to place the children in the care of someone other than their father. The magistrate judge then committed the children to CFSA "based on all the information presented"—which, as we know, the government had characterized as "very little information." The associate judge's unadorned affirmance of the magistrate judge's disposition, which addresses the father's constitutional claim in a short discussion focusing primarily upon the order for supervised visitation, indicates that the father's right must yield to his children's best interest, but does not specify how the evidence in this case defeated the father's parental presumption.

Two factors that were the focus of much discussion at the disposition, the

father's housing and his health, warrant particular mention. Throughout these proceedings the government opposed placing the children with the father—or even granting the father unsupervised visitation with his children—based in part upon its concern that the father did not have enough space in his home to accommodate the children and that his lung condition made it impossible for him to care for six active children. These are legitimate considerations under D.C. law, and each could be a relevant factor in the determination whether the government presented clear and convincing evidence that it was in the children's best interest to be placed with someone besides their father.[22]

The main problem with any serious reliance upon the father's purportedly inadequate housing and ill health, however, was that neither was well substantiated at the time of the disposition hearing. The government and the GAL gave great weight to the observation that the father remained sitting throughout a supervised

---

[22] Indeed, two statutes in related family law contexts specifically support consideration of parental health. D.C. Code § 16-2353, which sets forth factors to consider when evaluating a termination of parental rights petition, lists "the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child." D.C. Code § 16-2353 (b)(2). And D.C. Code § 16-914 includes "the mental and physical health of all individuals involved" in a best interest calculation as it relates to custody determinations outside of the abuse and neglect sphere. D.C. Code § 16-914 (3)(E).

visit with his children, that his lung condition required him to carry an oxygen tank, and that his apartment only contained two or three bedrooms. Yet these proffers hardly constitute a sufficient factual basis for deeming the father to be an unsuitable placement for the children.

And even if the government had established more definitively that the father's home was too small for six children and that his health was an impediment to his parenting, our cases have cautioned against too heavy reliance upon factors of this nature when making decisions that result in the removal of children from the custody of a parent. As "a parent's poverty, ill health, or lack of education or sophistication, will not alone constitute grounds for termination of parental rights," *In re J.G.*, 831 A.2d 992, 1000-01 (D.C. 2003) (emphasis added), nor should these factors be dispositive in a hearing that can have potentially permanent consequences.[23] *See In re S.G.*, 581 A.2d at 786 (Rogers, C.J., and Ferren, J., concurring). That is particularly true in this case, where prior to the children's

---

[23] "[O]ur child neglect statute . . . was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy." *In re J.G.*, 831 A.2d at 1000 (quoting *In re T.W.*, 732 A.2d 254, 262 (D.C. 1999)).

removal from their mother's home, the father had no reason to have a home large enough to accommodate all the children as full-time residents.[24] The court's decision to commit these children based in part upon inconclusive contentions of this nature reinforces our sense that it overlooked the parental presumption in its determination of what was in the children's best interest.

## B.     The Initial Hearing and the Reasonable Efforts Requirement

Our view that the court failed to apply the parental presumption at the disposition stage of this case is bolstered by a review of events that preceded the hearing at which the magistrate judge committed the children to CFSA. Though our decision to remand this case for reconsideration of the disposition decision obviates our formal consideration of the father's claim that he was deprived of his due process rights at the initial hearing,[25] early events in this case shed light upon

---

[24]    In any event, we have routinely held that "[f]amily poverty is not a reason, in and of itself, to find a child neglected, even if it plausibly could be argued that the child's best interests would be served by removal to a materially wealthier home." *In re A.H.*, 842 A.2d 674, 687 (D.C. 2004). Instead, "[w]hen it is poverty alone that causes an otherwise fit parent to be unable to care for her child, adequate public or private benefits should and will be made available to the family[.]" *Id.*

[25]    We note, in addition, that the father's appellate counsel essentially acknowledged at oral argument what the government also emphasized in its

(continued...)

the court's subsequent disposition and seemed to set the stage for the continuing inattention to the father's presumptive right to the care of his children.

Two statutes make clear that the rights of parents carry significant weight at the point of the initial shelter care determination. The first, D.C. Code § 16-2310 (b), states that before a child can be placed in shelter care prior to a factfinding or dispositional hearing, it must be clear that shelter care is required "(1) to protect the person of the child" or "(2) because the child has no parent, guardian, custodian, or other person or agency able to provide supervision and care for him, and the child appears unable to care for himself," *and* that "(3) no alternative resources or arrangements are available to the family that would adequately safeguard the child without requiring removal." D.C. Code § 16-2310 (b). The second, D.C. Code § 16-2312, requires the family court to determine whether "(A) [r]easonable efforts were made to prevent or eliminate the need for removal, or, in the alternative, a determination that the child's removal from the home is necessary regardless of any services that could be provided to the child or the child's family;

---

(...continued)
brief—namely, that the father's challenges to the initial hearing were rendered moot by the disposition order. Our disposition in this case likewise makes it unnecessary for us to address the father's challenge to the imposition of supervised visitation, as any additional factfinding on remand may affect matters of visitation.

and (B) continuation of the child in the child's home would be contrary to the welfare of the child." D.C. Code § 16-2312 (d)(3). These statutes require the government to make a showing that the children's placement in shelter care was the only available option to protect the children.

We recognize, as an initial matter, that the mother's waiver of a probable cause hearing and her stipulation that the children were neglected had the curious effect of turning the trial court's focus away from the children's father—in some ways legitimately, as "the relevant focus for the court in neglect proceedings is the children's condition, not parental culpability." *In re T.G.*, 684 A.2d 786, 789 (D.C. 1996) (citation and internal quotation marks omitted). We also cannot reasonably fault the government for any initial failure to contemplate placing the children directly with their father upon their removal from their mother's home. CFSA had reason to believe one or more of the children were being physically abused, and all it knew about the children's father was that he had been admitted to a hospital and that no one seemed to know which one.

Yet from the very outset of this case, and at every turn, the father presented himself as the best placement option for the children and urged the magistrate judge to grant him custody of his children. When the court denied these requests,

he filed a motion to reconsider, and when the court denied that motion, he asked for custody under protective supervision. At the initial hearing, when the father was out of the hospital and available to care for the children, his attorney's very first statement was to ask that the children be released into the father's care. The magistrate judge still found that "the efforts made with this family to prevent removal were in fact reasonable"[26] but then specified somewhat differently in the initial hearing order that due to the extraordinary circumstances—namely, the injury to P.S.'s eye, the risk that P.S.'s siblings would also be abused, and the initial inability to locate the father—"the fact that no reasonable efforts were made is hereby deemed reasonable."

While these findings may satisfy the reasonable efforts requirement of D.C. Code § 16-2312 (d)(3), it is not clear that they address D.C. Code § 16-2310's prohibition on placing a child in shelter care unless there is *no parent* able to

---

[26] The judge based her finding upon the allegations in the complaint, the fact that CFSA had convened a family team meeting, the fact that the father was not "physically available at that time to serve as a resource," and the fact that the family had had prior contacts with CFSA. Counsel for the father disputed the significance of the prior contacts and argued that each of the referrals was either unfounded or inconclusive. The court considered the prior contacts while explicitly "not taking any position with respect to the outcomes in those cases" and without resolving the disputed issues.

provide supervision *and no alternative resources* that can be made available to safeguard the children. In this regard, the government appeared to downplay and then delay confirming the father's, mother's, and children's assertions that the father lived separately from the family—a claim that was critical to the father's request for custody of his children and that the trial court refused to accept without further investigation by CFSA. The government also questioned both the mother's and father's insistence that one of the children, K.M., was already living at her father's home at the time of the children's removal, that her name was on her father's lease, and that her name was *not* on her mother's lease.[27] The father's attorney, asking that K.M. be returned to the care of her father and that he also be granted custody of the other children who lived with their mother, stated that "[t]here are no allegations against him in the petition" and "we're prepared to prove" that K.M. lived with her father.

To her credit, the magistrate judge, though finding the government's efforts reasonable, pressed the agency on many of these matters and urged it to investigate

---

[27] When the government indicated at the initial hearing that the mother was receiving social security payments for K.M., the mother stated that this was not true and that she did not receive social security, while the father stated that he *did* receive social security and that he had K.M.'s papers at home.

the father as a placement option. The court nonetheless agreed with the agency that "it would be contrary to the welfare of all of the children to return home at this time," noting that the agency needed more time to investigate this issue. These exchanges exemplify the government's mindset throughout the early stages of these proceedings—a mindset that resembled a presumption against the father rather than a recognition of his heightened interest in the placement of these children.

### III. Conclusion

As in *In re J.F.*, the father here "promptly and continuously asserted his right to custody of the child[ren]." 615 A.2d at 597 (citing *In re S.G.*, 581 A.2d at 783 n.17). And also as in *In re J.F.*, the court did not apply the presumption in favor of the children's father, did not make any express finding—and was not asked to make any finding—that their father was unfit, and did not have a record before it that adequately supported such a finding. 615 A.2d at 598-99; *cf. In re S.G.*, 581 A.2d at 787 (Rogers, C.J. and Ferren, J., concurring) (noting the trial court's "insufficient factual basis for determining where [the child's] best interest lay"). What is known from the record is that this father was involved in his children's lives, that they spent weekends together, that the children viewed

themselves as having two different homes, that they felt safe with their father, that they "love[d] going to dad," and that the father's sister, who was the children's caretaker since they moved from the foster homes, viewed her brother as "a great father." At the disposition hearing, a social worker stated that the father's visits with his children were "going well," that there were "no problems or concerns," and that "everybody [was] enjoying visits." While the government leveled allegations regarding the father's anger management issues, his physical inability to care for the children, the children's dental neglect, and the family's history of contacts with CFSA, the magistrate judge "never made any findings regarding the father's fitness," *In re S.G.*, 581 A.2d at 787 (Rogers, C.J. and Ferren, J., concurring), stated that his health "may or may not be one factor to be considered," and made the decision to commit the children while leaving many factual disputes unresolved. In affirming the order committing the children, the associate judge likewise never characterized the father as unfit and never specified, if he was fit, what evidence justified the rebuttal of his right to presumptive custody of his children.

We conclude that the trial court applied an incorrect legal standard by failing to give meaningful weight to the parental presumption before it rejected the

43

father's request for custody of his children and committed them to CFSA. We therefore reverse the trial court's order affirming that disposition and remand this case so that the trial court may incorporate the parental presumption into its analysis. Absent a showing that the father has failed to meet the threshold criteria for custody, the government must prove by clear and convincing evidence that awarding him custody would be contrary to the children's best interest.

*So ordered.*