**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-FS-0386

IN RE L.M., APPELLANT;

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-NEG-000082)

(Hon. Judith Smith, Trial Judge)

(Argued May 11, 2023                    Decided May 11, 2023[*])

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

*Melissa Colangelo*, with whom *Rajan Bal* and *Katherine Piggott-Tooke* were on the brief, for Children's Law Center, as Guardian ad Litem, for appellant L.M.

*Pamela Soncini*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for appellee District of Columbia.

MCLEESE, *Associate Judge*: Appellant L.M., through her guardian ad litem, sought summary reversal of an order placing her in shelter care. *See* D.C. Code § 16-2301(14) (defining "shelter care" as "temporary care of a child in physically

---

[*] On the date of argument, the court issued an order granting L.M.'s motion for summary reversal. This opinion, originally issued as an unpublished memorandum opinion and judgment on September 12, 2023, explains our reasoning. The opinion is being published on December 21, 2023, with minor changes, upon the court's grant of the guardian ad litem's motion to publish.

unrestricting facilities, designated by the [court], pending a final disposition of a [neglect] petition"). The District of Columbia filed a cross-motion for summary affirmance. We reverse.

## I. Factual Background

On May 1, 2023, the District of Columbia Child and Family Services Agency ("CFSA") took emergency custody of L.M., who was approximately five months old. CFSA then filed a petition alleging that L.M. was a neglected child under D.C. Code § 16-2301(9)(A)(ii) (child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [child's] physical, mental, or emotional health") and (iii) (child's "parent, guardian, or custodian is unable to discharge . . . responsibilities to . . . child because of incarceration, hospitalization, or other physical or mental incapacity"). At a hearing on May 4, 2023, the trial court heard proffers and took evidence as to whether the allegation of neglect was supported by probable cause and whether to order shelter care going forward. D.C. Code § 16-2312(d)-(f).

### A. Evidence at Probable-Cause Hearing

The evidence at the probable-cause hearing included the following. On May 1, 2023, L.M.'s mother K.M. was admitted to George Washington University Hospital ("GWUH") complaining of fever, stomach pain, vomiting, and an apparent seizure. CFSA received a call reporting concerns about K.M.'s ability to care for

L.M. In response to the call, Emma Kwegyir-Afful, a CFSA social worker and mental-health clinician, went to GWUH. When Ms. Kwegyir-Afful initially spoke with K.M., K.M. was "alert" and used "nonverbal cues like shaking [her] head, nodding, and . . . signing with her hands to communicate." Ms. Kwegyir-Afful did not know how to use sign language, and no sign-language interpreter was present, despite Ms. Kwegyir-Afful's request that GWUH staff obtain one.

Ms. Kwegyir-Afful left K.M.'s hospital room but later returned and spoke with K.M. At that point, K.M. said that she went to the hospital because she was not feeling well and had a fever of 104 degrees. Ms. Kwegyir-Afful asked K.M. whether there was anyone Ms. Kwegyir-Afful could call to care for L.M. while K.M. was in the hospital. K.M. replied that there was "nobody and neither can I." At this point, Ms. Kwegyir-Afful told K.M. that K.M. was experiencing a mental crisis and that a caregiver for L.M. had to be found. When Ms. Kwegyir-Afful informed K.M. that L.M. might have to go into foster care if K.M. could not find someone to care for her, K.M. stated that she would rather have L.M. go into foster care than have L.M. stay with K.M.'s family, which included "drug addicts, sex offenders, users, and other things."

Stephanie Gannon, a GWUH social worker, told Ms. Kwegyir-Afful that K.M. was initially communicative but at some point stopped communicating. Nursing staff told Ms. Kwegyir-Afful that K.M. at one point "suddenly stopped

communicating" and was "using sign language." Ms. Kwegyir-Afful estimated that K.M. was "nonverbal" for approximately five hours during Ms. Kwegyir-Afful's visit.

Nursing staff told Ms. Kwegyir-Afful that they determined that neither K.M.'s bloodwork nor a CT scan indicated that K.M. was having physical symptoms, and nursing staff believed that K.M. was experiencing a mental-health crisis. According to hospital staff, K.M. had been to GWUH previously for the "same concerns." Nursing staff also provided Ms. Kwegyir-Afful with information suggesting that K.M. was a missing person from Oklahoma. Based on this information, Ms. Kwegyir-Afful conducted an internet search of K.M.'s name and found a video of K.M.'s mother reporting that K.M. had been missing since 2019 and that K.M. has schizoaffective disorder, epilepsy, and the mental capacity of a ten-year-old.

Ms. Kwegyir-Afful observed L.M. with a nurse in a room separate from K.M. and conducted a physical assessment of L.M. Ms. Kwegyir-Afful concluded that L.M. was free of any marks, scars, or bruises; was dressed appropriately; was able to maintain eye contact with Ms. Kwegyir-Afful; moved around like a normal baby; was developmentally and physically on track; and appeared of normal weight for her height. Ms. Kwegyir-Afful had "[n]o concerns as it relate[d] to [L.M.'s] physical care or wellbeing at [that] time." Ms. Kwegyir-Afful observed a diaper bag containing diapers, and GWUH had provided formula for L.M. CFSA nevertheless

took emergency custody of L.M. on the ground that K.M was having a mental-health crisis, could not care for L.M., and had no one else available to care for L.M.

K.M. was discharged from GWUH on May 2, 2023. The next day, Bianca McDonald, a CFSA social worker and mental-health clinician, visited K.M.'s apartment at Sasha Bruce transitional housing to evaluate whether L.M. could safely return home. K.M.'s two-bedroom, one-bathroom apartment had "minimal furnishings," and K.M. explained that the apartment was somewhat dirty because she had been unable to secure cleaning supplies. There were, however, a crib, a changing table, and other items that an infant would need.

Ms. McDonald found K.M. to be "very pleasant," well-spoken, and transparent about her past experiences. K.M. told Ms. McDonald that K.M. had only completed formal education through fourth grade and that her written communication skills were "self-taught." K.M. later showed Ms. McDonald a missing-persons poster that was created when she ran away from her home in Oklahoma in 2019 and contained a photo of K.M. wearing a backpack; K.M. explained that the picture was taken on one of the last instances she had attended school before leaving Oklahoma. K.M. explained that there was "abuse and neglect" in her Oklahoma home environment and that she had experienced human trafficking. Ms. McDonald found the information K.M. provided about her departure from Oklahoma to be "contradictory," citing an example in which K.M. at one point said

that she took a bus directly from Oklahoma to Washington, D.C., and at another point stated that she had traveled to all fifty states involuntarily and had been moved across the country as a trafficking victim.

K.M. explained to Ms. McDonald that she had also received services from a number of other social-service organizations and entities in the District, including the Latin American Youth Center ("LAYC"), a program called SMYAL, Martha's Table, Mary's Center, and a home nurse. K.M. told Ms. McDonald that SMYAL had previously forced her to schedule an abortion and that K.M. had experienced several miscarriages and stillbirths before giving birth to L.M. K.M. further said that she had been diagnosed with complex post-traumatic stress disorder and autism. K.M. reported that while she lived with her family in Oklahoma, K.M. took 160 medications daily, but she now prefers homeopathic and non-pharmaceutical treatments. K.M. explained that she had been unable to communicate verbally at times during her recent emergency-room visit because she was in a postictal period following a seizure—an occurrence that constitutes a "full reset" of her brain and often requires some time to return to normal functioning. K.M. also told Ms. McDonald that she had received medication while at GWUH that K.M. believed might also have affected her ability to communicate verbally.

When Ms. McDonald asked K.M. to describe how she financially supported L.M., K.M. explained that a number of friends and community resources supported

K.M. and provided her with access to things like baby formula and diapers. K.M. acknowledged that some of her friends were drug users.

K.M. mentioned that one of her friends—a person named Michelle—could potentially serve as a caregiver for L.M. if needed. Ms. McDonald sent a text message to Michelle using the phone number K.M. provided, but Ms. McDonald had not received a reply by the time of the hearing. Ms. McDonald also spoke to two on-site Sasha Bruce staff members, and Ms. McDonald was concerned that they were unfamiliar with K.M.'s potential mental-health concerns. Sasha Bruce staff members informed Ms. McDonald about a domestic-violence incident that took place approximately one month before the hearing. They explained that police had responded to a call regarding a potential robbery in which K.M.'s romantic partner was the perpetrator and K.M. was the victim.

Based on these conversations, Ms. McDonald was concerned that K.M. demonstrated "some potential delusional thought content with a significant amount of grandiosity," "elaboration," and "contradict[ion]" in the personal history K.M. described. Ms. McDonald's clinical assessment of K.M. was that there was a "very strong likelihood" that K.M. was experiencing "heightened" mental-health symptoms. Ms. McDonald's greatest concern for L.M.'s safety arose from K.M.'s conduct during her emergency-room visit, which Ms. McDonald described as "creat[ing] incredibly significant concern that [K.M.] was experiencing a psychotic

episode." Ms. McDonald explained that psychotic episodes generally happen more than once, and that if K.M. were to experience another psychotic episode, K.M.'s symptoms—including her apparent inability to communicate verbally—could prevent her from ensuring L.M.'s safety. Ms. McDonald also expressed concern that both CFSA and other health-care providers lacked information about K.M.'s mental-health symptoms and any formal diagnoses she might have. Further, Ms. McDonald doubted the degree of oversight K.M. had from Sasha Bruce staff members, who had not reported the potential domestic-violence incident to CFSA.

Michelle Dai Zotti—K.M.'s friend and the person K.M. suggested could become L.M.'s emergency caregiver if needed—testified that she met K.M. at a playground in their neighborhood in February 2023. Ms. Dai Zotti lives in a two-bedroom apartment with her husband and her two-year-old son, works as a program manager at an international non-profit organization, and holds a master's degree in international relations. K.M. stayed with Ms. Dai Zotti for one week in February 2023 while K.M. waited to be placed in an apartment. Ms. Dai Zotti saw K.M. again in March and once more shortly before the hearing, when the pair went for a walk. In addition to those in-person visits, K.M. and Ms. Dai Zotti communicated daily on the phone. Ms. Dai Zotti described K.M. as a caring and loving mother. Ms. Dai Zotti had observed K.M. feeding L.M. every two or three hours, playing with L.M., changing her diaper, and cleaning L.M. Ms. Dai Zotti had

never observed K.M. behaving in an inappropriate way toward Ms. Dai Zotti's son; in fact, Ms. Dai Zotti had left K.M. alone with her son on one occasion. Ms. Dai Zotti had not witnessed K.M. display behaviors that led Ms. Dai Zotti to be concerned about K.M.'s mental health, and Ms. Dai Zotti never felt uncomfortable with K.M. in her home or spending time with Ms. Dai Zotti's son. Ms. Dai Zotti offered to serve as an emergency contact for K.M. and as an emergency caregiver to L.M. if needed. Ms. Dai Zotti denied having received any text message from Ms. McDonald.

Benita Sholar, one of the Sasha Bruce staff members with whom Ms. McDonald met and a mental-health professional, testified that she generally communicates with K.M. daily Monday through Friday, frequently in person. Sasha Bruce is an independent-living facility that covers rent, utilities, and cable and internet service for its residents. Three staff members operate the program from 7 a.m. to 5 p.m. on Monday through Friday, and staff is unavailable on the weekends. L.M. accompanied K.M. during each of K.M.'s in-person visits with Ms. Sholar, and Ms. Sholar observed that K.M. "engage[d L.M.] appropriately" by making happy faces, cooing, and playing with L.M. None of these interactions left Ms. Sholar concerned about K.M.'s care for L.M. K.M. had recently been approved for permanent supportive housing and case-management services.

Approximately four weeks before the hearing, a couple of residents contacted Sasha Bruce staff complaining of vomiting, diarrhea, and headaches; K.M. complained of the same symptoms around this time. Ms. Sholar described K.M. as appearing sickly, weak, and fatigued. On May 1, 2023, K.M. sent Ms. Sholar an email reporting that K.M. had a high temperature and was going to seek medical attention. In a follow-up email, K.M. informed Ms. Sholar that she had sought help at a fire department while en route to the hospital. Later that day, Ms. Sholar spoke to a CFSA social worker and explained that K.M. had never had difficulty communicating with Sasha Bruce staff and that Ms. Sholar considered K.M. to be an effective communicator.

Ms. Sholar explained that she would be able to provide support for K.M. and L.M. when the Sasha Bruce office is open, and that although she has previously cared for children whose parents were hospitalized, she cannot take such children home. Ms. Sholar testified that she was not aware of a violent incident occurring at K.M.'s apartment; she explained that she was aware that the police were called, but she was unsure why.

K.M. testified as follows. She had a high fever on the morning of May 1, 2023. While on her way to urgent care to seek treatment, K.M. felt nauseated and decided to stop at a fire station for a COVID-19 test. At the fire station, K.M. was

informed that she would need to be transported to the emergency room in an ambulance due to the fever and other symptoms she presented.

K.M. had a seizure approximately three or four hours after arriving at GWUH. During the seizure, and for approximately one-and-a-half hours thereafter, K.M. was unable to care for L.M.; GWUH staff cared for L.M. during that time frame. K.M. had experienced one other seizure in the last year, and approximately five or six years before the hearing, she experienced another situation in which she was unable to communicate verbally. K.M. had been diagnosed with complex post-traumatic stress disorder and high-functioning autism. K.M. does not take medication for these conditions and prefers homeopathic and non-pharmaceutical methods of managing her mental health. K.M. is fluent in American Sign Language, which served as her primary means of communication during the first eight years of her life because she was non-verbal during that time.

K.M. receives assistance from Sasha Bruce; her friend Michelle, whom K.M. had seen in person at least fifteen times; Martha's Table, where she purchased diapers and other supplies; LAYC, where she purchased the same, in addition to completing a parenting class; Mary's Center, where K.M. receives mental-health services two or three times per week; and a home nurse, who K.M. estimated visits weekly, and who checks K.M.'s and L.M.'s vitals, monitors L.M.'s development, and brings resources like formula, diapers, and toys.

Finally, K.M. denied having been a victim of a crime on the day the police responded to her apartment, although K.M. recalled a stranger knocking on the door of her apartment.

## B. Trial Court's Decision

The trial court concluded that CFSA had established probable cause to believe the allegations in the neglect petition were true. The trial court also continued L.M.'s shelter-care placement. The trial court generally credited all of the witnesses except for K.M., finding that K.M.'s testimony was contradicted by other testimony, was internally inconsistent, and "didn't necessarily make logical sense" at times. By way of example, the trial court found that K.M.'s indication that she saw Ms. Dai Zotti in person fifteen times or more conflicted with Ms. Dai Zotti's testimony that, apart from the week when K.M. stayed in her home, K.M. and Ms. Dai Zotti saw each other in person one or two times.

It was not entirely clear to the trial court whether a significant medical and physical issue or a mental-health issue caused K.M. to go to the hospital, and the trial court acknowledged that the information that GWUH provided to CFSA was inconsistent with a conclusion that K.M. was experiencing a physical issue. The trial court determined, however, that whether K.M.'s physical health or mental health led K.M. to seek medical care, K.M. was unable to care for L.M. for a period of time. The trial court concluded that K.M.'s testimony reflected a lack of

understanding about the need to have a caregiving plan in place for L.M. in case of a short-term lapse in K.M.'s ability to serve that function. Acknowledging that it was not in a position to diagnose K.M., the trial court observed that K.M. "seem[ed] to be a bit detached from reality."

The trial court noted that K.M. had taken some steps toward building a satisfactory emergency-care plan for L.M., including reliance on Ms. Dai Zotti, but expressed concern that K.M. did not appear to "truly accept" her mental-health diagnosis. Because Sasha Bruce staff are only on site from 7 a.m. to 5 p.m. on weekdays, the trial court found that K.M. was not adequately connected to mental-health services in an "ongoing way" and it was unclear what resources K.M. would be able to access in the evenings and during weekends. The trial court also found that the District had made "reasonable efforts" to prevent L.M.'s removal, including contacting K.M.'s relatives.

After the hearing, the trial court issued a written order memorializing its conclusions that continued shelter care was required (1) "to protect the person of" L.M., or (2) "because [L.M.] has no parent, guardian, custodian or other person or agency able to provide supervision and care for [L.M.]" and "no alternative resources or arrangements are available to the family that would adequately safeguard [L.M.] without requiring removal."

## II. Legal Standards

As previously noted, when CFSA believes that a child is neglected, CFSA may place the child in shelter care before any proceedings have begun in a neglect case if certain statutory requirements are satisfied:

> A child shall not be placed in shelter care prior to a factfinding hearing or a dispositional hearing unless it appears from available information that shelter care is required –
>
> (1)    to protect the person of the child, or
> (2)    because the child has no parent, guardian, custodian, or other person or agency able to provide supervision and care for him, and the child appears unable to care for himself and that
> (3)    no alternative resources or arrangements are available to the family that would adequately safeguard the child without requiring removal.

D.C. Code § 16-2310(b)(1)-(3).  When the issue arises in court, CFSA bears the burden of showing that shelter care is required, but the applicable statutes and court rules do not specify the magnitude of that burden.  *See id.*; *id.* § 16-2312(d)(1) (at end of shelter-care hearing judge "shall" order shelter care if the judge "finds that . . . shelter care is required under the criteria in [D.C. Code] section 16-2310"); Super. Ct. Neg. R. 13(a) (government has burden to show that shelter care is required).

Court rules list numerous factors relevant to determining whether shelter care is necessary.  Super. Ct. Neg. R. 13(b)(1)-(5), (c)(1)-(4).  Before placing a child in shelter care, the trial court must determine both that no alternative arrangements are

available that would "adequately safeguard the child without requiring removal" and that no other custodian is available to adequately care for the child. Super. Ct. Neg. R. 13(d)(1)-(2). The trial court must also "evaluate the harm to the child that may result from removal." Super. Ct. Neg. R. 13(e). Finally, in neglect cases, an order of shelter care must include a determination of whether (1) reasonable efforts were made to avoid the need for removal, or removal would be necessary regardless of the services that could be provided; and (2) placing the child in the child's home would be contrary to the welfare of the child. D.C. Code § 16-2312(d)(3).

We generally review the trial court's rulings in neglect cases for abuse of discretion. *In re D.S.*, 88 A.3d 678, 691 n.21 (D.C. 2014) ("In conducting [a] review of the trial court's orders in neglect proceedings, we employ an abuse-of-discretion standard and evaluate whether the trial court exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor.") (internal quotation marks omitted).

### III. Analysis

We first flag an issue that we need not and do not decide. As previously mentioned, the applicable statutes and court rules do not explicitly specify a standard by which to measure the District's burden of proof in connection with a trial court's decision whether to order continued shelter care at the end of the shelter-care hearing. D.C. Code §§ 16-2310(b)(1)-(3), 16-2312; Super. Ct. Neg. R. 13(a). L.M.

argues that the District should bear the burden of proof by a preponderance of the evidence. The District argues that its burden should "at most" be to establish probable cause. Because we conclude that the District failed to carry its burden even under a less-demanding probable-cause standard, we assume without deciding that a probable-cause standard applies.

It is true that there was a period at the hospital where K.M. was not able to care for L.M. Such a period could arise, however, for any parent facing a health emergency. As the District appears to acknowledge, whether shelter care was necessary going forward depends on the extent to which there was a sufficient risk that similar periods would arise in the future during which neither K.M nor other resources would be available to care for L.M.

It is also true that the record supports the trial court's conclusions that K.M. had mental-health issues that had not been fully addressed. What we conclude is lacking, however, is adequate support in the record for a conclusion, even at the level of probable cause, that K.M.'s mental-health issues were sufficiently likely to endanger L.M.'s welfare as to make shelter care necessary. We reach that conclusion for several reasons.

First, it is uncontested that L.M. presented at the hospital as an entirely healthy child. Second, there was ample evidence, from witnesses the trial court generally credited, that K.M. generally functioned well as a caregiver to L.M. Third, there

was ample evidence as to various support systems and resources available to K.M,
including various social-service agencies and K.M's friend Ms. Dai Zotti. *Cf. In re
D.S.*, 88 A.3d 678, 695 (D.C. 2014) (noting that District is required to "make a
showing that . . . placement in shelter care was the only available option to protect
the children"). Finally, there was no clear evidence, and no clear finding by the trial
court, as to the precise nature of K.M.'s mental-health issues or the likelihood that
those mental-health issues would recur in a way that would endanger L.M. *Cf. In re
K.M.*, 75 A.3d 224, 231 (D.C. 2013) (requiring, in context of neglect finding based
on mental incapacity of parent, that District "demonstrate the existence of a nexus
between a parent's [ ] mental incapacity and an inability to provide proper parental
care").

For the foregoing reasons, we granted L.M.'s motion for summary reversal,
remanded the case to the Superior Court, and directed the Superior Court to return
L.M. to the custody of K.M., subject to conditions imposed by the Superior Court.

*So ordered.*